UNITED STATES of America, Plaintiff,

v.

WILLIAM SAVRAN & ASSOCIATES, INC., a New York Corporation, d/b/a "Successful Systems"; Dr. William Savran; "John Does Nos. 1–10"; and "Jane Does Nos. 1–10", Defendants.

No. CV 90–4445 (ADS).

United States District Court, E.D. New York.

Jan. 29, 1991.

Andrew J. Maloney, U.S. Atty., E.D. N.Y., Brooklyn, N.Y. by Stephen J. Riegel, Asst. U.S. Atty., for plaintiff.

Newmark, Lamb, Dowling & Marchisio, Garden City, N.Y. (James W. Dowling, of counsel), for defendants.

## OPINION AND ORDER

SPATT, District Judge.

Seeking vulnerable consumers who, in the hopes of earning "exceptional money" in the comfort and safety of their own home, paid $27 for the "Successful Systems" product, William Savran & Associates, Inc. now finds itself the subject of a criminal indictment for mail fraud and the

defendant in this related civil forfeiture proceeding. Before the Court at this time is the motion of the defendants to vacate the warrant that seized a bank account, and the cross-motion of the plaintiff to freeze the defendants' assets, among other relief sought.

## I. BACKGROUND

By a verified complaint in rem in a civil forfeiture action, dated December 17, 1990, the plaintiff United States of America ("the plaintiff") requested that a warrant be issued for the "arrest" of the defendant bank account at Citibank, 2-1 Park Plaza, Glen Head, New York. The action was brought pursuant to 18 U.S.C. §§ 981, 1956 and 1957, and also 18 U.S.C. § 1345 and 28 U.S.C. § 1355. A warrant for the arrest of the said bank account was issued on December 17, 1990 listing, as potential claimants: Dr. William Savran, William Savran & Associates, Inc. and Successful Systems. The warrant was executed and the bank account was seized and/or frozen in its entirety. Apparently the account was not physically seized, but only frozen.

By order to show cause dated December 26, 1990, the defendant William Savran ("Savran") moved for an order "vacating the warrant seizing" the said bank account. On December 27, 1990, the return date of the motion by Savran, the plaintiff also presented an order to show cause in support of a motion requesting a broad spectrum of relief including enjoining the defendant from sending out any mailings or advertisements from the "Successful Systems" business pursuant to 18 U.S.C. § 1345. The plaintiff also requested a temporary restraining order asking for a wide range of remedies similar to the request in the order to show cause.

An evidentiary hearing was held on both parties' applications on December 27, 1990 and December 28, 1990. Pursuant to Fed. R.Civ.P. 52(a), the following constitutes the Court's findings of fact and conclusions of law (*see also Society for Good Will to Retarded Children, Inc. v. Cuomo*, 902 F.2d 1085, 1088 [2d Cir.1990]; *Weitzman v. Stein*, 897 F.2d 653, 658 [2d Cir.1990]).

## II. THE HEARING

The following is the evidence that was adduced at the hearing on the motions and the Court's findings of fact based thereon.

### a. *The Plaintiff's Case.*

John McDermott, a United States Postal Inspector, testified that he investigated "Successful Systems", the defendants' business, since approximately September 1990 and reviewed the various documents mailed to potential consumers by the defendant William Savran & Associates, Inc. ("Associates"). McDermott explained the system used by Associates to effectuate the "Successful Systems" program, as follows:

The potential consumer is contacted in one of two ways: either by an advertisement in a magazine or by direct mail. The direct mail ad (Plaintiff's Exhibit 1 in evidence) is the first document the consumer receives. It consists of eight separate pages and an envelope. Nowhere in these single-spaced pages is there any mention of the product to be sold. At the outset the Court finds that on its face the document is intentionally vague, ambiguous, confusing and difficult to read and comprehend. A repetitive reading of the paper did not substantially improve the Court's comprehension. Relevant portions of the initial document, which bear quotation, are as follows:

> **" 'SUCCESSFUL SYSTEMS'**
> **Post Office Box 815**
> **Horace Harding Station**
> **Flushing, New York 11362**
>
> HOMEWORKERS NEEDED NOW!
>
> 'Revolutionary' home-mailing
> program pays you
> up to $100 per single order.
>
> **You never have to buy stamps, envelopes, circulars, or any supplies.**
>
> Dear Friend (if not now—soon!),

If you're anxious to earn exceptional money (up to $300.00, or more, each day) doing simple, pleasant work in the comfort and safety of your own home, you're going to love what my company has to offer you.

My name is Lisa Michaels. As Vice President of 'Successful Systems', a reputable mail order firm, I am pleased to announce that we are looking for a limited number of 'home-workers' to help us mail our offers out to the MILLIONS of people, who we could NEVER possibly reach, even if we were to work around the clock!

*At present there are many ordinary people, from all walks of life, who have no special skills or previous experience, who are earning up to $300/day or more, working as 'INDEPENDENT HOMEWORKERS' under the expert guidance of our company!* There people call our 'HOME–MAILING PROGRAM' ... *'The fastest, easiest, and best way to make money without ever leaving your house or apartment.'*

What makes our program 'UNIQUE' is the fact that with our system you will NEVER be required to purchase ANY postage stamps, envelopes, or circulars for as long as you stay in our program.

*We have the ONLY program available anywhere that pays you TWO WAYS!* ... Not only will you receive $1 for every envelope that you secure for us and STUFF with our offers ... you will also receive 50% COMMISSION on every sale generated by your mailings! ... Up to $100/ORDER! Commission checks are mailed out weekly!

I can assure you that as a participant in our program, you will NEVER mail out anything objectionable or pornographic. There are no quotas to meet, and no-one will be looking over your shoulder. You can work as much or as little as YOU want. You are your own boss! There are no contracts to sign, and we further GUARANTEE that your name will never appear on any of our circulars. And don't forget, commission checks are sent out from our home office ... *EVERY WEEK! NO LONG WAIT*

... to get all the money you have coming!

It doesn't matter where you live! Whether you come from a big city, or live on a farm ... YOU can earn all of the extra money you need to catch up on those overdue bills, or simply to enjoy a BETTER LIFE with more spendable MONEY FOR YOU!

THIS IS NOT A 'GET RICH QUICK' SCHEME ... It makes me so mad to know that several men and women who could greatly benefit from this outstanding opportunity will not do so because they are skeptical. Some questionable hit-and-run operations have given 'homework' a black eye. Some have promised millions of dollars to their homeworkers! Believe me, you'll never become a multimillionaire working for my company, or any other firm. But, if you want to earn some very good money quickly, for easy to do pleasant work, we can help you! You're going to love this program ... it works!

'SUCCESSFUL SYSTEMS' OFFERS YOU IMMEDIATE PROFITS! We provide simple step-by-step instructions with your complete HOME MAILING KIT, easy enough for a child to understand. It doesn't matter where you live, big city or small town, in all 50 states. Little space is required ... a spare bedroom is great, but the kitchen table will also do just fine. *Some people perform our homework tasks while watching TV.*

Just 1 or 2 hours a day (or evenings) will allow you to accomplish the simple at-home tasks required. I'm proud of the fact that many of our valuable homeworkers have called our program 'The easiest and best way to make money at home.' No contracts ... nothing to sign. Your name will never appear on any advertising, but you can soon be receiving good money ... paid weekly ... for doing simple homework.

If you're eager to make fast profits with this exceptional homework program, take action NOW! We require a one-time only, small registration fee of $25 to

register you as one of our Preferred Independent Homeworkers.

NO RISK MONEY–BACK GUARANTEE ... You are the judge! You must be 100% pleased ... absolutely delighted ... or you may return all materials within 30 days, and we'll cheerfully refund your one-time registration fee.

Yours Truly,

Lisa Michaels (Vice–President)

'Successful Systems'

P.S. It is important that you do act NOW! We seek only a limited number of new homeworkers. Avoid disappointment ... take action right away! You'll be glad you did."

An additional sheet in the enclosure headed by the large darkened letters **"Revolutionary Home–Mailing Program"** reiterates that the consumer will be paid $1.00 for every envelope you stuff plus 50% commission on every sale (up to $100/order). Again, this page clearly states that the plan "NEVER requires you to purchase ANY envelopes, postage stamps or circulars for as long as you stay in the program."

What program? What product? The Court finds that by reading the initial eight-page inducement ad, a reasonably prudent person could not ascertain such information.

Also enclosed in the package is the "No-risk Homeworkers Application". For $25 plus $2.00 for "S & H", or a total of $27, "Rush me my complete Home-mailing Kit", with the right to an "immediate refund".

The Court finds that there are a number of false and/or misleading and/or deceptive statements in the ad.

First, the Court agrees with Inspector McDermott that any consumer who reads this ad would believe that he or she would be stuffing envelopes and get paid a commission based on such envelopes. In actuality, the "program" apparently has nothing to do with stuffing envelopes.

Second, nowhere in the ad is there any mention of *any* product whatsoever.

Third, and, significantly, nowhere in the ad does it say that the consumer will have to spend his or her own money to place ads in newspapers and periodicals. In fact, the ad implies that there will be no expense to the consumer ("You never have to buy stamps, envelopes, circulars or any supplies").

After reading the "come-on" ad (Plaintiff's Exhibit 1), the unwary consumer sends $27 to Associates and then receives Plaintiff's Exhibit 2, a brochure entitled, " 'Successful Systems' Home–Mailing Program Procedure Manual, by Lisa Michaels". Now the consumer is advised that he or she will be a "registered distributor of our HOTTEST MONEY–MAKERS, specifically we offer a No–Nonsense way to $550 a day". Still no mention of the product or the program. On page two of the manual the consumer is again assured that he or she "never have to spend one cent on any circulars, envelopes or stamps".

On page two, the consumer is finally advised what to do—"Your only expense in this program will be for placing one or more inexpensive classified ads". The consumer is advised to place a classified advertisement, as follows:

" 'A NO–NONSENSE WAY TO $500 A DAY!' ... $1 + Self Addressed Stamped Envelope (SASE) ... Your name and address."

When the consumer places the ad(s) he or she will then receive replies containing $1.00 in each reply and he or she will stuff the self-addressed stamped envelope. With what? With circulars (Plaintiff's Exhibit 3) that advertise "A No–Nonsense way to $500 a Day". Still no mention of the product to be sold. The second consumer fills out a coupon and sends $20 to the first consumer (with immediate refund rights). The coupon states, "Please rush me a copy of your 'ultimate' home business plan". Still no mention of any product or program; only double-talk and evasive, confusing language for an anonymous product.

McDermott testified that this plan is in the nature of a chain letter because the first level of consumer pays $27 and advertises to the second level of consumer who pays $20. Of this $20, the first level con-

sumer keeps $10 of the $20. The second line consumer gets the same manual (Plaintiff's Exhibit 2) and they, in turn, place ads and bring in a third level consumer. According to Inspector McDermott, "after approximately ten levels, you will run out of the number of people on earth that could qualify as purchasers ..." and such a plan is in the nature of a chain letter or pyramid scheme. The Court notes that chain letters violate the mail fraud statute (*see, e.g., United States v. Armantrout*, 411 F.2d 60, 61–62 [2d Cir.1969], *citing Blachly v. United States*, 380 F.2d 665, 672 [5th Cir.1967] [other citations omitted]).

Plaintiff's Exhibit 3 is a document sent to the first consumer with the manual. In this document there are similar vague and misleading representations such as:

**"NO INVESTMENT."**

"My ingenious, 'FAST–PROFIT' income discovery is a 'UNIQUE', and perfectly legal method of making HUGE AMOUNTS OF MONEY from home that has NEVER been advertised before! My method is 100% LEGITIMATE and has absolutely NOTHING to do with Multi-level Marketing, Envelope–Stuffing, Gambling, Chain Letter Schemes, or any other GIMMICK!

### ALL NEW!

In fact, what I am referring to is an ENTIRELY NEW METHOD that makes use of a 'little-known' professional secret developed by MILLIONAIRES to amass HUGE amounts of money FAST!; ... It is very unusual and uniquely designed for each person that uses it! ... In fact it is a 'fool-proof' NEW WAY to earn up to $15,000 monthly WITHOUT having to work for it! ... Believe me, ANYONE can do it! ... EVEN YOU! ... Because your age, prior experience, or place of residence simply DO NOT MATTER! ... And the best part is you can work my plan from the comfort and privacy of your home, WITHOUT leaving your present job!

### WORK FROM HOME!

\*    \*    \*    \*    \*    \*

... If you OWE MONEY, my program will have you 'DEBT–FREE' in NO TIME FLAT!!

\*    \*    \*    \*    \*    \*

... Just imagine opening your mailbox every week to find $3,000 worth of CASH, CHECKS, and MONEY–ORDERS all made out to YOU!! ... With my program it WILL HAPPEN!

\*    \*    \*    \*    \*    \*

### NO COMPETITION!

The one thing you'll NEVER have to worry about using my system is COMPETITION! There are over 45,000,000 'NEW' prospects each and every year, throughout the United States and Canada, who DESPERATELY NEED what you will have to offer! ... You'll be doing people a Real Favor! ... You'll be a HERO! ... Showing people how to obtain something that they DESPERATELY WANT and NEED, something that they are now GLADLY paying 100's of dollars OR MORE for ... PRACTICALLY FREE!!!!!

\*    \*    \*    \*    \*    \*

### COPY MY SUCCESS!

If you can read English and follow simple, step-by-step instructions you can easily duplicate my success! ... Everything has been CAREFULLY worked out for you! ... You will be provided with EVERYTHING you'll need ... NOTHING is left to CHANCE! ... And the best part is, there is NEVER anything else to buy for this business from me or ANYONE ELSE!"

This flyer again emphasizes the "complete refund" available, which is the apparent "fail-safe" feature of this operation.

As to the "money" portion of the flyer (Plaintiff's Exhibit 3), it continues, as follows:

"Simply PRINT your name and address CLEARLY on the NO–RISK COUPON below. Clip it and mail it to me along with ONLY $20 in cash, check, or money-order and I'll RUSH you my business plan and FREE BONUS REPORT via

FAST FIRST CLASS MAIL!! ... Shipping is FREE! ... Don't MISS OUT! ... Do it NOW!

### ACT TODAY

... I don't care if you are a professional person, a housewife, a high school student, or a RETIRED senior citizen! ... You owe it to yourself and your loved ones to CHECK ME OUT! ... Completely at MY RISK! ... I GUARANTEE THAT YOU HAVE NEVER SEEN SUCH AN 'HONEST' plan, with absolutely NO CATCHES, that can produce income as quickly and effortlessly offered anywhere! ... FOR ANY PRICE! ... I PERSONALLY GUARANTEE IT!

30 DAY, NO-RISK COUPON!

'SUCCESSFUL SYSTEMS'

P.O. Box 815 Dept. (    )

Horace Harding Station

Flushing, New York 11362

Please RUSH me a copy of your 'ULTIMATE' Home Business Plan and FREE BONUS REPORT via FAST FIRST CLASS MAIL! I understand that if after trying your system for 30 days I am not ABSOLUTELY DELIGHTED for ANY REASON that I may return it for an IMMEDIATE REFUND! ... On that basis here is my $20 in:

Cash □ Check □ Money-Order □

Name_____

Address_____

City_____

State_____Zip_____"

All this verbiage and still no product named nor any explanation of any program or system.

Nowhere in Plaintiff's Exhibit 3 does it say that the consumer will have to place and pay for ads. In fact, as quoted above, the ad specifically states that "... the best part is, there is NEVER anything else to buy for this business from me or ANYONE ELSE!" (Exhibit 3).

So now we have the first consumer sending $27 to Associates and advertising, and the second consumer sending $20 to the first consumer, who keeps $10 and forwards the other $10 to Associates. All of this transpires without even the mention of a product, and with only an intentionally vague and unclear mention of the type of program involved. All of this is initiated by an implicit no-expense representation, which the Court finds to be intentionally false.

Plaintiff's Exhibit 3 is headed in large letters with the proclamation "A NO-NONSENSE WAY TO $500 A DAY". According to Inspector McDermott the only way a consumer could earn $500 a day under this plan would be to obtain 40 additional customers per day (½ of $20 is $10 times 50 people is $500 per day) and "arithmetically you would just run out of people as you get further down the line from the chain" (Tr. p. 39).[1]

McDermott further testified that he had two boxes of consumers' complaints mailed to postal authorities with regard to "Successful Systems". There were "over 650 (complaints) with more arriving every day". He reviewed approximately two hundred complaint letters. There were two major types of complaints. First, the consumers thought they would be stuffing envelopes provided by "Successful Systems" and they (the consumers) would bear no expense. The second major source of complaint was that the promised refunds were never made. Some of the consumers wrote to Associates two or three times and did not receive a refund, as repeatedly and expressly promised in every circular.

When a consumer received the manual he or she discovered that there was actually no product involved and that further involvement on their part required the expenditure of money for ads. Commenting further on the complaint letters, McDermott testified as follows:

"People who responded to this, your Honor, are retired, single mothers, peo-

---

**1.** "Tr. p. __" refers to the page number of the transcript of the hearing held on December 27 and 28, 1990.

ple on limited income. And on face value it seems that these people would be able to earn a legitimate income from their home. Unfortunately, when they received the booklet, the Home Mailing Program from Successful Systems, a large number of them were able to see that there was no product involved and requested their money back, and were unable to do so, were unable to get it back.

\* \* \* \* \* \*

A large number of these letters were very emotional. They said sometimes their last 25 dollars that they received a month from the VA or Social Security check was sent. And they were quite upset when they found out that it doesn't have a job; they didn't have any employment; *and in fact the only way to make money was to deceive others and in fact to layout additional expense.*" (Tr. 43, 44; emphasis supplied).

Two of the letters in evidence are from Clara Dillinger (Plaintiff's Exhibit 4A) and George Ellis (Plaintiff's Exhibit 4B). The Dillinger letter, which is handwritten, reads as follows:

"On July 29 I sent 'Successful Systems' $27.00. I thought I was entering a program to mail their advertizing [sic] for a product.

They stipulated that if I wasn't satisfied with their program I would return their material and they would refund my money.

*They don't sell anything.* They just want people to send the same information they sent me to other people. To me that is cheating the public, so I returned their material.

They have *not* returned my money. I have written them twice.

  Sincerely,
  /s/ Clara Dillinger"

(emphasis in original).

The Ellis complaint, also handwritten, reads, in part, as follows:

"I received this kit on Monday 11/13/89; I was not impressed with it, as I saw that the 'Successful Systems' program involved a lot of newspaper advertising expense on my part which their sales letter made no mention of. I then promptly returned their starting kit materials to them ... and requested my $27.00 back ... To date, I have heard or received nothing. Please help me get my money back from this rip-off.

  /s/ George W. Ellis 12/4/89"

Based upon his experience as a postal inspector, in the opinion of Inspector McDermott, the "Successful Systems" program "is nothing more than a chain letter pyramid scheme in which no product is involved, and is only sustained by recruiting other members to sell in essence the same nothing program" (Tr. p. 54).

Further, in his opinion as a postal inspector, the initial solicitation sent out by "Successful Systems", Plaintiff's Exhibit 1, "is filled with deceptions and misrepresentations" in that: (1) it mentions nothing about advertising costs; (2) it mentions nothing about the major thrust—to recruit others to join and sell similar programs; (3) it says nothing about the product involved; and (4) it promises a refund within thirty days.

On cross-examination, Inspector McDermott testified that he did not know how much of the $410,000 in the seized bank account constituted monies derived from the "Successful Systems" program. While on cross-examination he summed up his analysis of the defendants' program as follows:

"Q Tell me, how did this scheme work?
A Again, when somebody answers an advertisement in the hopes that they would be employed stuffing envelopes, they receive a program, a booklet. After paying $27 they receive this booklet which tells them to spend additional money advertising essentially the same program in which you can make up to $500 a day."

Although counsel for the defendants vigorously tried to bring out that the Association was selling two products, namely, (1) a pamphlet entitled "How to 'erase bad credit' and reprint rights", and (2) mailing lists, McDermott stated:

"A In answering an ad in a way to make $500 a day. That's what they are answering. They are not answering to buy mail order lists. Nowhere in that ad does it say send a dollar to buy a coupon to buy mail order lists, no one would buy it then." (Tr. p. 96).

\* \* \* \* \* \*

"A Sir, when they paid the $27 they were not aware that they would have to spend additional money for advertising, period." (Tr. p. 101).

It is significant that while the defendants' fliers state that they have a way consumers could make $500 per day, they never mention the report on "How to erase bad credit" as *the* product. In sum, for $27, the customer received a brochure telling them to pay to advertise a nebulous and concealed product.

### b. *The Defendants' Case.*

The sole witness for the defendants was the defendant William J. Savran, a duly licensed dentist who was in practice from 1971 to 1986, at which time he left dentistry to enter the "Medicard ID" business. In November 1987, he incorporated his business as William Savran & Associates, Inc. Dr. Savran (and, apparently, Associates) presently have only one commercial bank account in which he deposits all income received by him from whatever source derived. Included in the deposits is income from his Medicard ID business and the "Successful Systems" business, among other ventures. Also, from this account he pays all of his business expenses, including rent, salaries, advertising and postage expenses. In addition, he pays income taxes, withholding taxes and even his child support from this single account. Material to this discussion, he also pays refunds on the Successful Systems "product" from this account. The payments of these expenses by Associates and Dr. Savran have been severely disrupted by the seizure and freezing of the account by the plaintiff.

Dr. Savran admitted that he previously was involved with a chain letter scheme, when, after a complaint was issued by the postal inspector, he discontinued the prior plan.

In November 1987 he entered into an oral agreement with Julia Picard, doing business as Mail Depot, Ltd., to perform "mail order" work for him, including the mailing of refunds. He received the consumers' complaints and referred them to Ms. Picard. On November 1, 1990, Associates purchased Mail Depot Ltd. from Julia Picard for $35,000. Dr. Savran blames Julia Picard for the failure to make timely refunds as to the Successful Systems plan.

As to the "Successful Systems" phase of his business, Dr. Savran developed the idea in "probably 1988, around the beginning of 1989". He was looking for distributors "to help me sell my mailing lists and my other offer of $500 a day" (the brochure to erase bad debts). Dr. Savran personally prepared the brochure "How to erase bad credit" over a six week period, and had obtained a registered copyright.

Dr. Savran explained the purpose of his original letter (Plaintiff's Exhibit 1), as follows:

"Q And in that letter could you explain, what was the purpose of that letter?
A To get distributors who would be salesmen for me selling my products.
Q And what product did you have to sell?
A Well, I had two products.
Q What were the products?
A One was the reports on How to Erase Bad Credit and the other was mailing lists. I had been selling that report on credit for several years very successfully. I figured if I get distributors to do the same thing I would duplicate my efforts.
Q When you did them and you sent them, and they answered your ads, they contacted you. And what did you send them then? This particular letter?
A The letter, yes, sir.
Q Was there a fee for them to do something further afterward?
A Yes. If they have [sic] wanted to participate they would have to send a $27 fee and they would receive the home mailing kit.

Q Now, when they became a distributor how were they to earn any money on this?

A They would earn money by making sales and getting a commission on each and every sale.

Q What kinds of sales did they make?

A They made two types of sales. One was for the erase bad credit program, which is a program that somebody can actually sell and make money each time they do it. That was one. And the other thing they could sell if they wish, was the mailing list.

Q *Now, in the literature you send to them did you explain to them anything that they would have to outlay any money for themselves in order to take part in the program?*

A *No.*

\* \* \* \* \* \*

Q *Now, when they sent out the particular letter in here was there anything in your original ad that said anything about advertising?*

A *No, there wasn't."*

(Tr. pp. 142–43, 147; emphasis supplied).

Although they were not previously advised, in order to continue in the plan, the consumers were required to place ads at a cost of from $6 to $100 per week.

In early 1990, Dr. Savran began having problems with Julia Picard, with regard to consumers who were not getting requested refunds. According to Dr. Savran, he had no control over the activities of Julia Picard and she allegedly embezzled his postage money. When he discovered this problem, he immediately fired her, wrote out the refunds and eventually purchased her business. Oddly, even though Ms. Picard failed to make refunds and stole monies from him, Dr. Savran purchased her business for $35,000.

Dr. Savran testified that he never received a "cease and desist" order from the Postal Service and that he first became aware of any complaints when he was arrested (Tr. p. 154). He testified that Associates made refunds to all of the people named in the Government's papers. He further stated he had no intent to defraud anyone or to misrepresent anything to anyone. He stated that today, people are still ordering and reordering from him; that "hundreds and hundreds" of people are satisfied with his products and "several" make good livings from his mailings (Tr. p. 158).

On cross-examination, Dr. Savran testified that "probably 25 percent" of the proceeds in the seized bank account is attributable to Successful Systems (Tr. p. 163). He is the only person who works for Successful Systems although his wife Lisa Savran helps him once in a while. The "Lisa Michaels" mentioned in the fliers (Plaintiff's Exhibit 1) and manual is his wife, who is Vice President of Associates (Tr. pp. 168–69).

Dr. Savran had another bank account at the Roosevelt Savings Bank which he closed in July 1990 because the bank officials were concerned about the number of complaints from consumers who had not received refunds.

As to the initial letter to the consumers (Plaintiff's Exhibit 1), the following testimony of Dr. Savran may help explain the mysteries of the "Successful Systems" program, and is significant evidence:

"Q Dr. Savran, I would like you to take a look now at a document marked yesterday as Government Exhibit 1.

(Handed to the witness.)

Q Now, I believe you testified yesterday that this was an initial letter that Successful Systems sent out to consumers?

A Yes.

Q And I believe you also testified that once the persons paid $27 to Successful Systems the person would then receive a document marked Government Exhibit 2 which is entitled, Successful Systems Home Mailing Program Procedure and Manual?

A Yes.

Q You further testified that enclosed in Government Exhibit 2, which is the manual, there was an instruction book instructing the persons how to sell a circular which has been marked as Govern-

ment Exhibit 3, which says a No Nonsense Way to $500 a Day, to other consumers.

A  Yes.

Q  And that's accurate?

A  Yes.

Q  And you further testified that Government Exhibit 3, a No Nonsense Way to $500 a. Day, was advertising to sell either mailing lists or a booklet regarding how to prepare your bad credit rating?

A  Yes.

Q  And that's all accurate?

A  That is correct.

Q  Now, addressing your attention again to Government Exhibit 1, *show me where in that letter it says that what is being offered to the first level of customers is an opportunity to be a distributor to sell mailing lists or booklets regarding repairs to credit damage.*

A  *It doesn't say that.*

Q  *It doesn't say that anywhere?*

A  *No.*

\*       \*       \*       \*       \*       \*

Q  You testified yesterday that you spent a month or a significant period of time carefully writing out Government Exhibit 1, which is the initial letter from Successful Systems.  If what you are selling is a distributorship to sell mailing lists and booklets for credit repair why isn't that stated in your initial letter?

MR. LAMB:  Objection, Your Honor.

THE COURT:  Overruled.

A  Because it wasn't mentioned.

Q  Why wasn't it if that's what you were selling?

A  Is there a reason it should be?

Q  Well, normally isn't it normal when somebody advertising something to sell, that they describe what is being sold?

A  Not all the time.

Q  Not all the time.

*Did you intentionally draft Government Exhibit 1 so that it was not clear that what was being sold was a distributorship for mailing lists or bad credit booklets?*

A  You have to repeat the question.

MR. RIEGEL:  Can I have it read back, please?

THE COURT:  Yes.

(Whereupon, the court reporter reads the requested material.)

A  *Yes.*

Q  *You did?*

A  *Yes.*

Q  Why did you do that?

A  It is a technique used in the mail order business.

\*       \*       \*       \*       \*       \*

Q  *Now you testified that you intentionally drafted this so that it didn't state what was being sold.*

A  *That is correct"* (Tr. pp. 191–94; emphasis supplied).

\*       \*       \*       \*       \*       \*

"Q  You did say that you intentionally omitted information from Government Exhibit 1 as to the very nature of what you were offering and selling?

MR. LAMB:  Objected to, your Honor.

THE COURT:  Overruled.

A  I left out what the product is, yes" (Tr. p. 218).

"THE COURT:  Why did you do it?

THE WITNESS:  It is a technique used in selling business opportunities where people list the advantage of it.

THE COURT:  *It is a technique not to tell the potential distributors the product they were supposed to distribute?*

THE WITNESS:  *Correct.  And they are free not to buy it.*

Q  But they don't even know what they are buying; isn't that true?

A  Specifically?

Q  *Let me ask you, would you think a consumer reading this letter would get from it that what was being sold was a right to a distributorship to sell mailing lists and credit report?*

A  *Not specifically, no.*

Q  *They would not?*

A  *Correct"* (Tr. p. 195; emphasis supplied).

\*       \*       \*       \*       \*       \*

"Q Looking again at Government Exhibit 1, *does it state anywhere in there, directly or indirectly, that a consumer paying $27 will receive a kit which instructs the consumer to spend additional money to place ads, or to send out direct mail in order to sell your products?*

A *Does it say that anywhere?*

Q *Yes.*

A *That they have to place an ad, no.* But there is always advertising and promotions for anything you do. It doesn't say everything in the world would be free. It says the supplies would be free. There is no intimation that there would be no other expense for ads or anything else" (Tr. p. 197; emphasis supplied).

(Tr. pp. 191–197; emphasis supplied).

As to the amount Associates was receiving from consumers in the "Successful Systems" program, Dr. Savran testified that "[i]t could be as much as $50,000" per month (Tr. p. 203).

Dr. Savran was further questioned about Plaintiff's Exhibit 1 which in the third paragraph states "This is not a get rich scheme". Yet on page 7 of the Successful Systems Manual, sent out to consumers who respond to Exhibit 1, it says "Strike it rich!".

Dr. Savran further conceded that even in Defendants' Exhibit A, which is sent in response to the manual, there is no mention of the "improve your bad credit" pamphlet. It says it is "a no-nonsense way to $500 a day".

"Q Does it say anywhere to make—the way to make $500 a day, a No Nonsense Way, was to market Defendant's Exhibit A, How to Erase Bad Credit and Reprint Rights?

A No.

\* \* \* \* \* \*

Q Why didn't you say simply in Government Exhibit 3, the way to make $500 a Day is to try to market a report regarding erasing bad credit?

A I didn't mention it.

Q Isn't the reason because if you had said it accurately the amount of response you would have gotten, it would be negligible compared to what you have gotten?

A I don't know that to be true.

\* \* \* \* \* \*

Q With respect to Government Exhibit 1, the initial Successful Systems letter, isn't it accurate to say that if you had stated in there the truth of the matter what you were selling would be the distributorship to sell a bad credit report and mailing lists, and the amount of mailing you got which you said before as much as 50,000 a month would be much less than that figure?

MR. LAMB: Objection, your Honor. Asked and answered. The question was asked before and responded to.

THE COURT: Overruled.

A I don't know if it would or wouldn't I never did it the other way, so I don't know" (Tr. pp. 214, 216–17).

Dr. Savran could not estimate the amount of income he received from Successful Systems in 1989, although he guesses that it would be "[m]aybe 25 percent" of his total income (Tr. pp. 224–25). He doesn't think he has any business records that itemize his income or separately delineate the Successful Systems income.

With regard to the probability of anyone making $300 or $500 a day by using the "Successful Systems" program, Dr. Savran stated the following:

"Q So your statement that they can receive up to $500 a day has no basis in fact?

A Yes, it does. I was marketing the report and making about $500 a day or more when I first started marketing it myself.

Q Do you know anyone who is making 300 or $500 a Day [sic] every day they work on this?

A Personally, no. Myself, yes, sir. I have done it myself.

Q Just yourself?

A Yes" (Tr. p. 230).

## III. ADDITIONAL FINDINGS OF FACT

In addition to the findings of fact set forth above, the Court makes the following further findings:

1. Upon a review of all the fliers, manuals and enclosures mailed by the defendants in the "Successful Systems" program, this Court finds that the central thrust of these documents was to present a vague, confusing and incomprehensible sales promotion without mentioning the product to be sold or the real method of distribution. The Court further finds that these documents were intentionally designed to mislead and to induce innocent and unwary consumers to part with money—and so, the documents contain fraudulent misrepresentations. The flyer and manual solicit people to send in $27—for what, they could not know.

2. The defendant intended to create confusion and to misrepresent the truth in the solicitations, and thereby obtain a greater number of initial $27 responses from the consuming public.

3. The solicitation (Plaintiff's Exhibit 3), expressly states that "there is NEVER anything else to buy for this business from me or ANYONE ELSE!". This is not only misleading but the Court finds it expressly false.

4. The unconditional refund offer does not ameliorate this situation. First, there were a substantial number of unhappy customers who never received refunds. Second, it is reasonable to infer that only a small percentage of unsatisfied consumers even request a refund, so that the defendant is able to retain many of the $27 payments sent by customers who, after receiving the manual, do not go to the next step.

5. The use of the mails and United States Postal Service was and is an integral part of the defendants' business, and the defendant therefore used the mails in furtherance of the fraudulent "Successful Systems" plan.

6. The intentional nondisclosures and affirmative misrepresentations made by the defendants in the "Successful Systems" solicitations were material.

7. Harm and/or injury to the consuming public was or at least should have been reasonably foreseeable as a result of the advertisements and direct mailings and substantial monetary responses, ranging to as much as $50,000 per month.

## IV. THE APPLICABLE LAW

a. *Availability of Preliminary Injunctive Relief Under 18 U.S.C. § 1345.*

On this motion for a preliminary injunction, the plaintiff seeks relief under 18 U.S.C. § 1345, which provides in pertinent part:

"Whenever it shall appear that any person is engaged or is about to engage in any act which constitutes or will constitute a violation of [the mail fraud statute, 18 U.S.C. § 1341] ... the Attorney General may initiate a civil proceeding in a district court of the United States to enjoin such violation. The court shall proceed as soon as practicable to the hearing and determination of such an action, and may, at any time before final determination, enter such a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought. A proceeding under this section is governed by the Federal Rules of Civil Procedure, except that, if an indictment has been returned against the respondent, discovery is governed by the Federal Rules of Criminal Procedure."

■ To support an application for a preliminary injunction under 18 U.S.C. § 1345, the Government must demonstrate that "probable cause" exists to believe that the defendant is currently engaged or about to engage in a fraudulent scheme violative of either the mail, wire or bank fraud statutes (*see United States v. Belden,* 714 F.Supp. 42, 45–46 [N.D.N.Y.1987]).

Fraudulent Scheme Must be Ongoing.

■ Injunctive relief is authorized under section 1345 only when the alleged fraudulent scheme is ongoing and there exists a threat of continued perpetration; the statutory equitable remedy is not available for solely past violations (*see United States v. Cen–Card Agency*, No. 88–5764, slip op. at p. 14 [3d Cir. Mar. 23, 1989] [872 F.2d 411–414 (tables)]; *United States v. New Frontiers Real Estate Co.*, No. CV–89–2585, slip op. [E.D.Pa. May 8, 1989] [1989 WL 49519, 1989 U.S.Dist. LEXIS 5073]; *United States v. Jones*, 652 F.Supp. 1559, 1560 [S.D.N.Y.1986]).

As the evidence adduced at the hearing amply demonstrates, the alleged violations of mail fraud are ongoing and threaten to continue. The defendants solicited orders for the Successful Systems plan, which initially put the alleged pyramid scheme in motion. Orders from unwary consumers have been and continue to be placed with Savran. In fact, Savran testified that he still continues to receive orders. Those consumers who continue to participate in the scheme, perhaps unwittingly by simply following Savran's instructions, are ultimately increasing Savran's receipts from this fraudulent plan and continue to perpetrate its existence. The defendants are currently receiving thousands of orders (and dollars) per week in response to their mailings and advertisements. Finally, the Court finds it significant that there has been no indication from counsel for the defendants that the dissemination of mailings and advertisements would cease pending the outcome of the related criminal case.

Accordingly, the Court finds that this alleged fraudulent scheme is ongoing, and therefore preliminary injunctive relief pursuant 18 U.S.C. § 1345 is available at this juncture.

Irreparable Harm Not Necessary Under Section 1345.

■ The statute itself is silent as to whether the traditional elements, including "irreparable harm", must be demonstrated in order to obtain a preliminary injunction under 18 U.S.C. § 1345. In view of the plain meaning of the statute, such a showing is not required. Although it has been stated that "irreparable harm" need not be demonstrated to obtain an injunction under section 1345 (*see, e.g., United States v. Belden, supra*, 714 F.Supp. at p. 45), the Third Circuit, in an unpublished opinion, expressly declined to address the issue, since in that case such harm was *actually* demonstrated by the Government (*see United States v. Cen–Card Agency*, No. 88–5764, slip op. at p. 10 n. 4 [3d Cir. Mar. 23, 1989] [872 F.2d 411, 414 (tables)]).

The legislative history of section 1345 indicates a Congressional concern over the possibility that the consuming public could be victimized by permitting the continuance of a fraudulent scheme while a related criminal investigation or prosecution is underway, which, oftentimes could be a rather lengthy or protracted process:

"While present law provides limited injunctive relief [under 39 U.S.C. § 3005(a)], this relief is inadequate. First, the relief is restricted to the detention of incoming mail. It does not reach the situation where letters continue to be sent to further a scheme and remittances are collected personally from the customer or to fraudulent schemes which do not entail the use of the mails. Second, the required administrative proceedings entail considerable delay which is compounded by the extra time and energy necessary to bring an injunctive suit in the district court while the administrative proceedings are pending. Since the investigation of fraudulent schemes often takes months, if not years, before the case is ready for criminal prosecution, innocent people continue to be victimized while the investigation is in progress.

\* \* \* \* \* \*

For these reasons, the Committee has concluded that whenever it appears that a person is engaged or is about to engage in a criminal fraud offense proscribed by chapter 63 [including mail fraud], the Attorney General should be empowered to bring suit to enjoin the fraudulent act or practices" (S.Rep. 225, 98th Cong., 2d Sess. 401–02, *reprinted*

*in* 1984 U.S.Code Cong. & Admin.News 3182, 3539–40 [footnotes omitted]).

In *United States v. Belden, supra,* Chief Judge Munson observed that courts have traditionally not required a showing of irreparable harm to obtain a preliminary injunction under 39 U.S.C. 3007[2], rather only "probable cause" need be demonstrated. The court further noted that 18 U.S.C. § 1345 was "intended to make it easier for the government to obtain preliminary injunctions as a means of terminating fraudulent schemes during the pendency of criminal investigations than had been possible under 39 U.S.C. § 3007" (*United States v. Belden, supra,* 714 F.Supp. at p. 45).

In other areas where Congress has provided for Governmental enforcement of a statute by way of an injunction, the courts have consistently held that irreparable harm need not be demonstrated, and that so long as the statutory conditions are met, irreparable harm to the public is presumed (*see, e.g., United States v. Odessa Union Warehouse Co-op,* 833 F.2d 172, 175–76 [9th Cir.1987] [in action under Food, Drug and Cosmetic Act, Government need not demonstrate irreparable harm to obtain preliminary injunction]; *Government of the Virgin Islands v. Virgin Islands Paving, Inc.,* 714 F.2d 283, 286 [3d Cir.1983] ["when a statute contains, either explicitly or implicitly, a finding that violations will harm the public, the courts may grant preliminary equitable relief on a showing of a statutory violation without requiring any additional showing of irreparable harm"]; *Securities & Exchange Comm'n v. Management Dynamics, Inc.,* 515 F.2d 801, 808 [2d Cir.1975] [in SEC enforcement action, proof of irreparable harm unnecessary to obtain injunction]; *United States v. Cappetto,* 502 F.2d 1351, 1358–59 [7th Cir. 1974] [not necessary to establish likelihood of irreparable harm in RICO action brought by Attorney General], *cert. denied,* 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 [1975][3]; *United States Postal Serv. v. Beamish,* 466 F.2d 804, 806 [3d Cir.1972] [common-law requirement of irreparable harm and likelihood of success are inapplicable to injunctions sought under 39 U.S.C. § 3007]; *United States v. Schmitt,* 734 F.Supp. 1035, 1048–52 [E.D. N.Y.1990] [Government not required to demonstrate irreparable harm to obtain preliminary injunction under Rivers and Harbors Appropriation Act]).

Upon review of the Congressional intent gleaned from the legislative history, recognizing the scarcity of case law interpreting 18 U.S.C. § 1345, this Court is of the view that in seeking preliminary injunctive relief under 18 U.S.C. § 1345, the Government is not required to demonstrate a likelihood of irreparable harm, so long as the statutory conditions are met. Congress was concerned that an expedient remedy to combat an ongoing fraudulent scheme was needed to protect the unwary consuming public while a criminal investigation or prosecution was underway. In this Court's view, presuming irreparable harm once the Government demonstrates that the statutory conditions have been satisfied comports with this Congressional intent. Such an approach is also consistent with the weight of authority construing statutes in other areas of the law where Congress has expressly provided for the availability of

---

**2.** 39 U.S.C. § 3007 provides for the detention of mails for temporary periods, in relevant part, as follows:

"In preparation for or during the pendency of proceedings under sections 3005 and 3006 of this title, the United States district court ... shall, upon application therefor by the Postal Service and upon a showing of probable cause to believe either section is being violated, enter a temporary restraining order and preliminary injunction pursuant to rule 65 of the Federal Rules of Civil Procedure directing the detention of the defendant's incoming mail by the postmaster.... The district court may provide in the order that the detained mail be open to examination by the defendant and such mail be delivered as is clearly not connected with the alleged unlawful activity."

**3.** The Second Circuit in *Trane Co. v. O'Connor Securs.,* 718 F.2d 26, 29 (2d Cir.1983), stated in dicta that although the court had doubt over the availability of a preliminary injunction in a civil RICO action brought by a private party, irreparable harm must nonetheless be demonstrated. In so noting, however, the court distinguished *United States v. Cappetto, supra,* which "was an action brought by the Attorney General, not by a private party" (718 F.2d at p. 29).

injunctive relief at the behest of the Government. Accordingly, it is this Court's determination that it is unnecessary for the Government to establish "irreparable harm" under section 1345.

Even though a showing of irreparable harm is not necessary under section 1345, this Court finds that the Government has demonstrated that irreparable harm would occur in the event that a preliminary injunction is not issued preventing Savran and Associates from continued solicitation. Permitting the defendants to continue to perpetrate this alleged extensive mail fraud, in this Court's view, constitutes irreparable harm.

Additionally, since Savran commingles all of his income into only one bank account, there is the possibility that he might dissipate assets, thereby frustrating any later attempts at restitution. In other contexts, courts have held that the threat of transfer of assets could constitute irreparable harm (*see, e.g., Securities & Exchange Comm'n v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1105–06 [2d Cir.1972] [temporary freeze on defendant's assets pending SEC enforcement action to insure that they will be available to defrauded investors is permissible]; *cf. Republic of the Philippines v. Marcos*, 806 F.2d 344, 356 [2d Cir.1986] [preliminary injunctions are proper to preserve assets of a defendant to prevent attempts to make a judgment uncollectible], *cert. dsmd. sub nom. Ancor Holdings, N.V. v. Republic of the Philippines*, 480 U.S. 942, 107 S.Ct. 1597, 94 L.Ed.2d 784, *cert. denied sub nom. New York Land Co. v. Republic of the Philippines*, 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 [1987]; *Gelfand v. Stone*, 727 F.Supp. 98, 100 [S.D. N.Y.1989] [same]).

Finally, as the Third Circuit observed in a different setting, the continued operation of the Successful Systems program until a final determination on the merits could also irreparably harm the integrity of the postal system (*see United States v. Cen–Card Agency*, No. 88–5764, slip op. at pp. 12–13 [3d Cir. Mar. 23, 1989] [872 F.2d 411, 414 (tables)]).

Since the Court has determined that irreparable harm need not be established, and also that, in any event, it was demonstrated in this case, the Court must now determine whether the plaintiff has established that probable cause exists to believe that Savran "is engaged or about to engage in any act which constitutes or will constitute" mail fraud in violation of 18 U.S.C. § 1341 (18 U.S.C. § 1345). To make this determination, the Court turns to a review of the mail fraud statute, 18 U.S.C. § 1341.

### b. *Mail Fraud.*

The mail fraud statute provides, in relevant part, that it is unlawful for one to do the following:

"[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any thing or matter...."

In sum, in order to establish mail fraud under 18 U.S.C. § 1341, "the government 'must show that the defendant (1) participated in a scheme to defraud; and (2) knowingly used the mails to further the scheme'" (*United States v. Rodolitz*, 786 F.2d 77, 80 [2d Cir.], *cert. denied*, 479 U.S. 826, 107 S.Ct. 102, 93 L.Ed.2d 52 [1986], *quoting United States v. Gelb*, 700 F.2d 875, 879 [2d Cir.], *cert. denied*, 464 U.S. 853, 104 S.Ct. 167, 78 L.Ed.2d 152 [1983] [other citations omitted]). Furthermore, the Government must demonstrate "that the scheme was devised with the specific intent to defraud, ... that the use of the mails in furtherance of the scheme was reasonably foreseeable, ... [that] the de-

ceit must have gone to the nature of the bargain, ... that is, any nondisclosures or affirmative misrepresentations must have been material, ... [and] that some actual harm or injury was at least contemplated" (*United States v. Bronston*, 658 F.2d 920, 927 [2d Cir.1981] [citations omitted], *cert. denied*, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 [1982] ).

In *Schmuck v. United States*, 489 U.S. 705, 710, 109 S.Ct. 1443, 1447, 103 L.Ed.2d 734 (1989), the Supreme Court recently discussed this statute as follows:

" 'The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law.' *Kann v. United States*, 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944). To be part of the execution of the fraud, however, the use of the mails need not be an essential element of the scheme. *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). It is sufficient for the mailing to be 'incident to an essential part of the scheme,' *ibid.*, or 'a step in [the] plot,' *Badders v. United States*, 240 U.S. 391, 394, 36 S.Ct. 367, 368, 60 L.Ed. 706 (1916)."

■ Although the Government must prove that the defendant had a specific intent to defraud (*see, e.g., United States v. Amrep Corp.*, 560 F.2d 539 [2d Cir.1977], *cert. denied*, 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d 759 [1978] ), a showing of evil motive on the part of the defendant is not necessary (*see United States v. Simon*, 425 F.2d 796, 808–09 [2d Cir.1969], *cert. denied*, 397 U.S. 1006, 90 S.Ct. 1235, 25 L.Ed.2d 420 [1970] ), and such intent may be inferred through circumstantial evidence (*see United States v. Panza*, 750 F.2d 1141, 1149 [2d Cir.1984] ).

For the reasons above set forth at length and in detail in the Court's findings of fact, this Court finds that the Government has established that the defendants have engaged and continue to engage in a scheme or artifice to defraud in violation of 18 U.S.C. § 1341. The Successful Systems plan and the solicitations in connection with its implementation are intentionally vague, ambiguous and calculated to create confusion among unwary consumers in an attempt to fraudulently obtain $27 by misrepresenting the true nature of the "product" (if any) and the means to sell the product.

■ Additionally, the Court finds that this "product" is nothing more than a pyramid or chain-letter scheme. It is well settled that such a "pyramid" or "chain-letter" scheme constitutes mail fraud (*see, e.g., United States v. Armantrout*, 411 F.2d 60, 61–62 [2d Cir.1969], *citing Blachly v. United States*, 380 F.2d 665, 672 [5th Cir.1967] [other citations omitted] ).

Further, evidence that the mails were used to facilitate or further Savran's "Successful System" business is uncontroverted. In fact, use of the mails is not merely "incident", it is the essential nature of the defendant's business to utilize the mails to solicit and receive orders and money.

Accordingly, the Court finds that the plaintiff has demonstrated probable cause to believe that the defendant "is engaged or about to engage in" mail fraud violative of 18 U.S.C. § 1341, and therefore is entitled to a preliminary injunction.

The Court must now fashion an appropriate remedy.

#### c. *Remedy*.

The plaintiff seeks the following ultimate relief in connection with this action brought pursuant to 18 U.S.C. §§ 981, 1956 and 1957, 18 U.S.C. § 1345 and 28 U.S.C. § 1355:

1. Preliminary injunction preventing the defendants from soliciting orders in connection with the Successful Systems program.

2. Permanently enjoining the defendants from engaging in fraudulent mailing schemes in the future.

3. Restitution of the monies received from consumers.

4. An immediate accounting and freeze of the assets derived from the sales of the Successful Systems program.

5. The appointment of a receiver to receive the assets derived from the mailings.

6. Notice to all of the consumers of the Successful Systems plan.

7. Enjoining the defendant from receiving and responding to mailings in connection with the Successful Systems solicitation.

On this motion for a preliminary injunction, the plaintiff seeks the following immediate injunctive relief:

1. Preventing the defendant from sending out any mailings or solicitations or receiving any incoming mail relating to "Successful Systems".

2. Directing the Postal Service to detain the defendant's incoming mail, provided that the detained mail be open to examination by the defendant.

3. An accounting of the defendant's assets derived from "Successful Systems".

4. Prohibiting the defendant from altering, destroying or otherwise disposing or secreting business records.

■ When a court is called upon to exercise its equitable powers, it is axiomatic that it may provide whatever relief is necessary and proper to do complete justice under the circumstances between the parties (*see Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 298–99, 80 S.Ct. 332, 338–39, 4 L.Ed.2d 323 [1960] [Whittaker, J., dissenting]; *see generally* 1 S. Symons, *Pomeroy's Equity Jurisprudence* § 43, at p. 57 [5th ed. 1941] ["equity is nothing more or less than ... the power and duty of the judge to do justice to the individual parties in each case"]). If the public interest is involved, "those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake" (*Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 [1946]).

Section 1345 has been held to vest the federal courts with power to decree broad remedial preliminary relief (*see United States v. Cen–Card Agency*, 724 F.Supp. 313, 318 [D.N.J.1989]; *see generally* Twiss, *Boiler Room Fraud: An Operational Plan Utilizing the Injunction Against Fraud Pursuant to 18 U.S.C. § 1345*, 15 Pepperdine L.Rev. 503, 539–42 [1988] [broad overview of available remedies, including, appointment of a receiver, disgorgement, restitution and freezing assets]). Since the applicable statute is relatively new, however, there is little case law to provide guidance as to the specific preliminary remedies available under 18 U.S.C. § 1345.

In *United States v. Jones, supra*, where the indictment alleged that the defendant participated in a scheme to defraud elderly women by a "confidence game", the court denied the Government's motion for a preliminary injunction to freeze the defendant's assets pending the resolution of the related criminal trial. Significantly, however, Judge Haight denied the application on the ground that section 1345 was inapplicable, "since it is conceded that the assets in question do not constitute fruits of the scheme" (652 F.Supp. at p. 1560).

*United States v. Cen–Card Agency*, 872 F.2d 411, 414 (3d Cir.1989), involved the defendants' solicitations purporting to offer major credit cards with an initial limit of $2,850 without any credit investigation. After paying an initial fee of $39.95 (one-year membership) or $49.95 (lifetime), the consumers instead received a cardboard card entitling them to purchase assorted goods from an enclosed catalog only. The Third Circuit upheld the District Court's grant of a broad preliminary injunction under section 1345 that froze the defendant's assets and directed the defendant to advise its customers that they had a right to a refund.

In *United States v. Davis*, 88–1705–CIV, slip op., 1988 WL 168562 (S.D.Fla. Sept. 23, 1988), the defendant was alleged to have used the mails and wires to further a scheme to defraud which consisted of advertisements soliciting a $675 "placement fee" to assist persons obtain employment. After finding that the Government established probable cause to believe that the defendant engaged in mail and wire fraud, the court granted a preliminary injunction under 18 U.S.C. § 1345 directing the Postal

Service to detain the defendant's incoming mail, and also direct that all telephone service to the defendant's business be disconnected.

As to the request to freeze the bank account of the defendants, the Court finds the circumstances of this case closely analogous to the facts in *United States v. Cen–Card Agency, supra.* Unlike *United States v. Jones, supra,* the defendant here concedes that his Citibank account includes all of the monies received from consumers responding to the Successful Systems solicitations. Thus, the account the Government seeks to freeze and secure for future restitution to the many victims admittedly contains the fruits of the alleged fraudulent scheme. Accordingly, under 18 U.S.C. § 1345, the Court has the power to, and does, preliminarily enjoin or freeze the contents of the Citibank account, subject to the hearing referred to below.

The defendant contends, however, that even conceding that the Citibank account contains all of the receipts traceable to the Successful Systems business, the Court should not freeze the entire account, because the account also contains "legitimate" monies derived from sources other than from the promotion of the Successful Systems program. Put simply, although all Successful Systems money is in the Citibank account, not all money in the Citibank account is derived from the Successful Systems program. The defendant alleges that all of his liquid assets are contained in this one account and, as such, he is unable to pay bills as they become due.

Thus, the Court must determine how much, if any, of the money contained in the Citibank account should be exempt from the freeze.

To assist in this determination, the Court is guided by *United States v. Banco Cafetero Panama,* 797 F.2d 1154 (2d Cir.1986), a case arising under 21 U.S.C. 881(a)(6) involving the seizure and forfeiture of a bank account, a portion of which contained the proceeds of narcotics transactions. The Second Circuit explored the legislative history of the drug forfeiture statute and concluded that once the Government estab-

lishes probable cause to believe that a particular account contains specific proceeds traceable to illegal narcotics transactions, the burden shifts to the claimant to show that no portion of the account is traceable to narcotics proceeds. The rule was stated by Judge Newman as follows:

"once the Government has shown probable cause to believe that a person has sold drugs and has deposited the proceeds of a drug sale into a bank account, there will be probable cause to believe that the bank account contains 'traceable proceeds' of the sale (if the balance has not fallen below the amount of the deposit) *and* probable cause to believe that a withdrawal contains such 'traceable proceeds' (if the withdrawal exceeds the deposit). The burden will then be on the claimant to demonstrate that no portions of the account or no portions of the withdrawal, depending on which the Government pursues, are 'traceable proceeds' of the drug sale.... [T]he risk of uncertainty in determining the traceability of proceeds of drug sales is placed squarely on the claimant, once probable cause has been established. It would be inconsistent with this scheme to immunize from seizure bank accounts or withdrawn funds as to which probable cause exists to believe they are 'traceable proceeds' of drug transactions" (797 F.2d at p. 1160–61).

▮ Before the burden shifts to the "claimant", however, the government must first demonstrate that a *precise amount* of proceeds from the fraudulent scheme were deposited in a specific bank account which also contained untainted funds (*see Banco Cafetero Panama, supra; see also* D. Smith, *Prosecution & Defense of Forfeiture Cases* ¶ 4.03[4][d] [1991] ). Although *Banco Cafetero* was decided with regard to the narcotics trafficking forfeiture statute (21 U.S.C. § 881), this Court finds it sufficiently analogous to the statute involved in this case. The Court therefore will similarly allocate the burdens of proof with respect to the seizure of a bank account under 18 U.S.C. § 1345.

This approach is also sound as a matter of logic. The information with regard to the defendants' deposits, withdrawals and contents of their bank account is peculiarly within the knowledge and control of the defendants. This information is necessary to determine the amount of the fruits of the illegal activity deposited in the account. The burden, therefore, should be properly borne by the party having the required knowledge and seeking an exemption from forfeiture, once probable cause is demonstrated.

The Court also finds it significant that 19 U.S.C. § 1615, which governs the burdens of proof in forfeiture cases, provides that the Government bears the initial burden to show that probable cause exists that the defendant property is subject to forfeiture. The burden then shifts to the claimant to demonstrate that the property is not subject to forfeiture (*see also United States v. Premises & Real Property at 4492 S. Livonia Rd.*, 889 F.2d 1258, 1267 [2d Cir.1989] [drug forfeiture case]).

Accordingly, a hearing will be held to permit the defendants to prove, by a fair preponderance of the credible evidence, that some or all of the amounts on deposit in the account maintained at Citibank (No. 021–00089248 29809), are not proceeds from the sale of the "Successful Systems" plan. To the extent that the defendants prove that any sums are not fruits of the "Successful Systems" plan, those amounts will be exempt from forfeiture.

## V. CONCLUSION AND ORDER

Based upon the totality of circumstances in this case, including the Court's finding that the solicitations at issue are intentionally vague, misleading, false, never advised the potential consumer of the actual product or the method of distribution, as well as a consideration of the available precedents construing 18 U.S.C. § 1345, the Court denies the defendants' motion to vacate the warrant of seizure, and grants the plaintiff's motion for a preliminary injunction to the following extent:

1. The defendants, their agents, employees, officers and all persons acting in concert with them, are preliminarily enjoined from sending out mailings or advertising or otherwise soliciting orders in connection with the "Successful Systems" business.

2. The defendants, their agents, employees, officers and all persons acting in concert with them, are preliminarily enjoined from receiving any incoming mail relating to the "Successful Systems" business, including mail to the following address: P.O. Box 815, Horace Harding Station, Flushing, New York 11362–0815.

3. The United States Postal Service is directed to detain all incoming mail addressed to: P.O. Box 815, Horace Harding Station, Flushing, New York 11362–0815, provided that the detained mail is to be open to examination by the defendants and such mail that is not connected to the "Successful Systems" business is to be delivered to the defendants.

4. The defendants, their agents, employees, officers and all persons acting in concert with them, are preliminarily enjoined from altering, destroying, hiding, secreting or otherwise disposing of any records relating to the "Successful Systems" business, including, but not limited to, mailing lists, customer lists, financial records, memoranda, letters, whether in document or computer or other form.

5. The defendants, their agents, employees, officers and all persons acting in concert with them, are directed to maintain records of all refunds requested by consumers of the "Successful Systems" plan, all refunds made by the defendants to consumers to date, and all refunds requested but not made by the defendants. The defendants shall also immediately provide the plaintiff with copies of those lists. The defendants shall also continue to make refunds as requested by consumers.

6. The defendants, their agents, employees, officers and all persons acting in concert with them, are preliminarily enjoined from transferring, encumbering, liquidating, using, hiding, secreting or otherwise disposing of any monies contained in the Citibank account No. 021–00089248

29809, until a hearing is held to determine the specific amounts that the Government proves are subject to forfeiture, and the amounts the defendant proves are not fruits of the fraudulent scheme.

In this regard, the parties are directed to attend a conference on January 31, 1991, at 8:00 a.m., to set an expedited discovery schedule and a hearing date to afford the Government the opportunity to prove the precise amount of money contained in the account that is subject to forfeiture and to afford the defendant the opportunity to prove, by a fair preponderance of the credible evidence, that some or all of the monies contained in the Citibank account are not the fruits of the "Successful Systems" business and are therefore exempt from forfeiture.

SO ORDERED.