UNITED STATES of America, Appellee,

v.

William J. ARMANTROUT, Defendant-Appellant.

No. 431, Docket 32780.

United States Court of Appeals Second Circuit.

Argued March 28, 1969.

Decided May 16, 1969.

See also, D.C., 278 F.Supp. 517.

ments of 1966 (80 Stat. 830), which became effective February 1, 1967.

Maurice N. Nessen, New York City (Kramer, Lowenstein, Nessen & Kamin, and Steven T. Atkins, New York City, on the brief), for appellant.

Richard A. Givens, Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty., for Southern Dist. of New York, New York City, and Roger J. Hawke, Asst. U. S. Atty., on the brief), for appellee.

Before WATERMAN, MOORE and FRIENDLY, Circuit Judges.

MOORE, Circuit Judge:

William J. Armantrout (appellant) appeals from a judgment of conviction entered in the United States District Court for the Southern District of New York after a jury verdict. Appellant was found guilty on the first seven counts of an eight-count indictment charging him with use of the mails to defraud and to obtain money by false representations in violation of 18 U.S.C. §§ 2, 1341 and 3237. The eighth count, charging appellant and three co-defendants with conspiracy to violate the mail fraud statute, was dismissed at the close of the Government's case. The trial court sentenced appellant to one year on each count to run concurrently.

We are again faced with a "chain referral scheme" repeatedly held fraudulent under 18 U.S.C. § 1341. See United States v. Sterngass, Docket No. 32704 (2d Cir. December 18, 1968), where this

Court unanimously affirmed a conviction involving a somewhat similar "chain referral scheme." Blachly v. United States, 380 F.2d 665 (5th Cir. 1967); Nickles v. United States, 381 F.2d 258 (10th Cir. 1967); Fabian v. United States, 358 F.2d 187, 194 (8th Cir. 1966). Appellant was the president and owner of Modern Floor Fashions, Inc. (Modern), which employed a method of chain referral for selling carpets to customers in the New York area. The scheme, which experience has shown varies only slightly from case to case and from product to product, was disclosed by the testimony of Government witnesses who included a former salesman of appellant, one Robert Mellor, an employee of the bank which financed Modern's sales, and a number of former customers, in addition to exhibits used by Modern's salesmen in seeking to interest potential customers.

The operation of the scheme generally was as follows: prospective customers would be referred to Modern by a friend or neighbor who was already a Modern purchaser. The neighbor or friend would show the prospective customer new carpeting previously received from Modern and would state that he was getting it without having to pay for it. The prospective customer was then told that he too could receive carpeting at no cost if he "qualified" and, if he so desired, the friend would send his name to Modern.

Once the name was referred to Modern, three steps were required to effectuate the plan. First, Modern telephoned the prospective customer and arranged an appointment, most often for the evenings when both the husband and wife would be present. The second step was the interview. When the salesman arrived at a home, he was generally asked to be seated in the living room and he would, at that point, ask them who referred them to Modern. They would respond by saying that they saw the carpet at the home of a friend. The salesman would then ask whether the friend had told them anything else and in most cases they would say that the friend told them that they had received the carpeting or were getting it at no cost. The salesman

would then inquire whether they were interested in carpeting and, if so, what particular area of their home they would consider carpeting. If an affirmative response was made, the salesman would explain the chain referral system to them.

By referring friends to Modern, customers were to receive commissions which would go to the payment of their rugs. Customers were paid $60 for each sale to a person recommended by them, $40 for each sale to a person recommended by the second customer and $25 for each potential customer who listened to a full presentation. The Government's principal witness and a former Modern salesman, Mellor testified as to how the referral method was explained to prospective customers and how they were told it worked in paying for the carpet, as follows:

"Let's use an example that * * * 'A's' carpet cost $1,000. If he were to introduce us to ten people, five of who would qualify based on past sales performance, for each of the five people who took carpet in their home, he would receive $60, so five times $60 would be $360 [sic] for his effort there.

"In effect at that point his job is done because these five people now as they go out and each speak to * * * ten, of which five qualify, he receives $40 five times from each one of these five, $200 from each one or $1,000 which would give him a grand total of 1,360, which would in effect be more than the cost of say a $1,000 carpet.

"Now if his carpeting ran $1,500, obviously he would be short and he would have to go out and speak to more people in order to earn it or pay the difference."

Testimony at the trial also disclosed that salesmen used a printed booklet with customers entitled "The New Dimension —YOU in Advertising" which stated:

YOUR ASSURANCE OF SUCCESS
SUCCESSFUL EXPERIENCE
1% YOU, 99% WE, 100% RESULTS.

Booklets, also given to customers at the time of the original sales pitch and la-

belled "A PUBLIC SERVICE BULLE-TIN—YOUR MAGIC CARPET PLAN," with a picture of a man hauling away a huge bag of money, stated:

This brochure has been designed to help you achieve your goal of earning the entire cost of your luxurious carpet. By working closely with our public relations director we can and will achieve this goal quickly.

There followed a series of questions and answers including the following:

"Why should I wait for the public relations director? Because he is the proven, time tested key to your success * * *

\* \* \* \* \* \*

"Why you should stick to our system. Because hundreds of very satisfied customers before you have had great success by using our proven method.

\* \* \* \* \* \*

"Why you will be successful. Because you are on the plan. You know it must be good and others will feel the same way. Plus you are going to have guided help throughout the entire term of the agreement.

\* \* \* \* \* \*

"What others have done on our program. Many people from all walks of life have earned more than enough to pay for their carpeting and are now earning additional income to pay for other essential or luxury wants in life.

\* \* \* \* \* \*

"Your success is our only business."

The booklet further states:

"What do I say to these people? Exactly what the public relations director has told you to say * * *"

Salesmen also testified that they were instructed by appellant to tell customers it was "fantastic" that they could get their carpet at no cost. Prospective customers were therefore assured that success in earning the cost of their carpeting was guaranteed.

After the salesman completed his prepared presentation there were usually a few objections or questions to answer. The most frequently stated objection was "where does all the money come from" to pay for the carpeting. The answer given was that, if their credit was good, once the carpeting was purchased—that is, once a sales contract and a note were signed—financing would be arranged with the American Bank & Trust Company (American). In effect, Modern would sell a customer's note to American, which, in turn, would collect monthly installments frequently over a 36-month period. These installments were due regardless of whether or not commissions were earned.

Another frequent objection was that people felt that they did not know how to go about earning their commissions. The salesman would then explain the role of the customer relations man—also sometimes referred to in the trial and sales pamphlets as the public relations director—and that he would come to their home the day the carpet would be installed, "first to inspect it to make sure the carpeting is correct and then to sit down with them and to go over the methods and means whereby to create curiosity among their friends in order for them to get the names to submit to the company to keep the new business coming in" (Tr. p. 22).

Once a customer signed a contract and had his carpeting installed, the third step in the process occurred; he received his instructions on how to interest his friends. Customer relations men used the booklets which the customers received when they were first interviewed and dictated to customers a pitch which ran as follows:

"Helen—you're not going to believe it but I got that carpet at no cost * * * I don't know if you will qualify. If you do, perhaps you can get the carpeting the same way we did and at no cost."

The process would then begin all over again. New prospective customers whose names had been referred to Modern, would be telephoned, appointments arranged and the inquiry made whether

they too would like to receive carpeting at no cost. In this manner, customers purchased carpets and furnished names to Modern. Although they were assured by appellant's salesmen and the brochures noted above that they could earn the cost of their carpeting quickly and easily, most received nothing approaching the price of their rugs.

The appellant claims that the Government failed to prove the charges against him. On the other hand, the Government contends that the jury's verdict was amply supported by the evidence.

The testimony at trial and the exhibits clearly indicate that, under appellant's direction, the representations made to customers that they could readily get carpeting "at no cost" were false and fraudulent. Appellant makes no claim, nor could such a claim be made, that customers were not told that they could simply and speedily obtain carpeting at no cost. Nor does appellant claim that any significant number of customers did in fact earn their carpeting. Rather, appellant rests his claim that the Government offered insufficient proof of fraud on the grounds that theoretically some customers might have been able to earn the cost of their rugs and that the Government was required to call an expert in mathematical progressions to show the "impossibility" of appellant's "no cost" representations.

■ In a reply brief, filed after argument, appellant has retracted his claim that an expert should have been called. He now only claims that, although the Government need not establish "impossibility" through expert testimony, some evidence of impossibility should have been offered and was not. (Appellant's Reply Brief at pages 14 and 15.) However, schemes involving a geometric progression for the representations made to customers to come true have been repeatedly held fraudulent under the mail fraud statute without the need for expert testimony. United States v. Sterngass, supra; Blachly, supra; Nickles, supra; Fabian, supra. In fact this very point was raised in Sterngass and summarily

rejected by this Court. See Brief of Appellant, United States v. Sterngass, at page 9; Brief for the United States, United States v. Sterngass, at pages 8–9.

In regard to the Government's position that Modern could never fulfill its representations to customers because if everyone earned the price of his rug, Modern would earn no income, appellant responds that the most Modern paid out was only $100 for each carpet sold. The amount Modern would pay in commissions on the sale of a single rug was $60 to the recommending customer and $40 to the customer who referred the recommending customer to Modern. Since the rugs were overpriced, appellant contends that the challenged method would have been profitable so long as more and more customers joined in. However, this argument is fallacious because it would be impossible for every customer to have obtained a rug at no cost without the company going bankrupt. A company cannot be profitable if it pays out in commissions all that it takes in. In a scheme of this type, only a time lag will make it appear that a company is profitable unless, of course, promises were not fulfilled and customers did not earn the cost of their products.

Appellant freely admits that some customers did fail to achieve the results sought. He contends, however, that this was so either because they lacked aggressiveness or because customers recommended down the line were unable to supply more customers. Additionally, appellant states, "This type of selling generates 'fad' interest, which dies out after a boom." (Appellant's Brief at page 37.)

■ The net effect of these realities, as well as of the mathematical impossibility noted above, was that customers who were assured that they could earn the cost of the carpets quickly and easily —99 percent of the effort being furnished by Modern and one percent by the customers—could not do so. In short, Modern misrepresented to customers that they could earn their "luxurious carpet-

ing," plus "other essential or luxury wants in life" at no cost. The evidence adequately supported the jury's verdict.

The appellant next contends that there was a variance between the indictment and proof and that, therefore, the Government's argument on summation to the jury was improper. The appellant alleges that the indictment charged only one type of misrepresentation as "a part of" a "scheme," namely:

" * * * that [appellant] would make and cause to be made false pretenses, representations and promises that such consumers could have such products at no cost to them and could earn more in commissions than the price of such products, whereas in truth and in fact as said [appellant] then and there well knew, it would be impossible for consumers to obtain such products at no cost to them and impossible for consumers to obtain commissions in such amount."

Because the indictment read "could have" and "could earn" rather than "would have" and "would earn," appellant maintains that he was misled into believing that only one type of misrepresentation was being charged, that is, that it was impossible for the scheme to work and for Modern to be able to fulfill its promises, and not that misrepresentations were made to customers.

■ However, we find no meaningful or significant variance between the Government's proof of the manner in which representations were made and the indictment. The indictment charged a scheme whereby customers could obtain carpeting at no cost. The evidence showed that customers were promised that this could be done easily, that 99 percent of it would be done by Modern and that they only had to do one percent, supply the names. If there were any variance, it was de minimis and not sufficient to warrant reversal. United States v. Glaze, 313 F.2d 757 (2d Cir. 1963).

■ Additionally, the Government's opening statement fully disclosed that the thrust of its case would be on the misrepresentations and on the mathematical impossibility for the scheme to work as promised. No claim of unfair surprise was made at the trial and no continuance was requested and/or denied below. The appellant's claim of variance is rejected. United States v. Edwards, 366 F.2d 853, 872 (2d Cir. 1966), *cert. denied* sub nom. Jakob v. United States, 386 U.S. 908, 87 S.Ct. 852, 17 L.Ed.2d 782 (1967); United States v. Glaze, *supra.*

■ Finally, appellant seeks reversal based on the trial court's sustaining an objection to one question put to the Government's principal witness, Robert Mellor, on cross examination. The question was "During the course of your sales pitch, as a salesman, did you ever make a misrepresentation to any of the people that you sold carpeting to, knowingly?" Appellant claims that this was error because the question was relevant to intent to deceive if he answered "No." If Mellor had no intent to deceive, since the Government allegedly was seeking to attribute all that was done by Mellor and salesmen to appellant, appellant argues that it would have tended to prove that he also had acted in good faith. On the other hand, if Mellor answered "Yes," his answer allegedly would have impeached his credibility.

However, as appellant concedes, there was very little dispute as to the essential facts of the case, which were primarily disclosed by Mellor's testimony. Mellor, although a prosecution witness, was an extremely cooperative witness for the defense as well, and his credibility was not in issue. Furthermore, counsel for the defense, after the objection was sustained, did not dwell at all on the challenged question, nor did he seek to rephrase it or even inquire why the objection was sustained. He also did not make to the trial judge any of the arguments he makes here as to the purpose of the question. In fact, trial counsel for appellant quickly turned to another subject on cross examination. No basis, therefore, exists for pressing this contention in this Court. United States v. Indiviglio, 352

F.2d 276 (2d Cir. 1965), *cert. denied* 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966).

██ In cases of alleged commercial fraud of this type, resort must always be had to an objective approach. Naturally appellants will always disclaim fraudulent intent. Therefore, it must be the exclusive function of the jury to form its own conclusion after examining and appraising the evidence. On appellate review, the important question is: did the jury have submitted to it all the relevant evidence offered and was it properly instructed as to the essential elements of the crime charged? In these respects we find that the trial was conducted without error.

The judgment of the District Court is affirmed.

FRIENDLY, Circuit Judge (concurring in the result):

I concur in the result.