**UNITED STATES of America**

v.

**Stanley Ray BOND.**

**Crim. No. 71–178.**

United States District Court, E. D. Pennsylvania.

Sept. 24, 1971.

Carl J. Melone, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Robert M. Mardirosian, Watertown, Mass., for defendant.

## OPINION

LUONGO, District Judge.

Stanley Ray Bond is charged with bank robbery under 18 U.S.C. § 2113. A number of motions for discovery have been filed on his behalf under Rule 16, F.R.Crim.P. Most of the motions were resolved at the time of oral argument. Three of the motions (To be Furnished With Evidence Favorable To the Accused; To Inspect Physical Evidence; and To be Furnished With Statements of Promises, Rewards or Inducements) were held under advisement pending submission of additional memoranda of authority.

*Motion to be Furnished With Evidence Favorable to the Accused.*

In this motion defendant seeks to be furnished, prior to trial, "with all evidence which is of an exculpatory nature or which may be favorable to the accused * * *." The request is based upon the rule enunciated in Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963) that

" * * * the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

Defendant argues that since *Brady* prevents the government from withholding evidence favorable to him, it is obligated to give him such information in advance of trial, and further that the knowledge of all such evidence on the part of all police officers should be imputed to the prosecuting attorney.

The government takes the position, on the other hand, that *Brady* created no right of pretrial discovery, that its obligation under *Brady* is to conduct criminal prosecutions fairly and its conduct

in that regard must be examined after trial, not before.

As might be expected, there is some support for each of the divergent points of view expressed by the government and the defendant. The government points to United States v. Manhattan Brush Co., 38 F.R.D. 4 (S.D.N.Y.1965) as authority that Rule 16 does not authorize discovery of *Brady* type material. As additional support for this view, it is pointed out that Rule 16, which provides for pretrial discovery in criminal cases, was adopted in 1966, some three years after the *Brady* decision, yet it contains no specific provision for discovery of such information. Several cases have regarded that omission as strong evidence that the rule makers did not intend to provide for pretrial discovery of such information. United States v. Moore, 439 F.2d 1107 (6th Cir. 1971); United States v. Zive, 299 F.Supp. 1273, 1274 (S.D.N.Y.1969); United States v. Armantrout, 278 F.Supp. 517, 518 (S.D. N.Y.1968), aff'd 411 F.2d 60 (2d Cir. 1969).

Defendant's position has some support in the Local Rules of Criminal Procedure for the Northern District of Illinois, which provide (Local Rule 2.04)

"Pretrial Discovery and Inspection

(a) Within five (5) days after the arraignment the United States attorney and the defendant's attorney shall confer and, upon request, the government shall:

. * * * * * *

(6) Permit defendant's attorney to inspect, copy or photograph any evidence favorable to the defendant; * * * " 1

■■ Our research has failed to disclose any case adopting that interpretation of Rule 16. The matter has not been resolved in this circuit. See United States v. Fioravanti, 412 F.2d 407 (3d Cir.), cert. denied *sub nom.* Panac-cione v. United States, 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969), in which denial of a request similar to the one made here was held not to be an abuse of discretion when defendant failed to set forth a reasonable description of the requested information. Insofar as the case before me is concerned, it is not necessary to decide that point since the government has answered and represented that it "has no knowledge of any evidence of an exculpatory nature in its files." That answer by the government complies with the liberal version as expressed in the Local Rule of the Northern District of Illinois. I find no authority for defendant's contention that the government is obligated to make an affirmative effort to ascertain from law enforcement officials whether any of them may have knowledge of such information. I will not order the government to make such inquiry or search. The government is aware that by failing to take steps to ascertain whether such information exists, it may conceivably run afoul, at trial, of the pitfalls of *Brady*.

Except to the extent that the government has already answered, defendant's Motion to be Furnished With Evidence Favorable to the Accused will be denied.

*Motions to Inspect Physical Evidence and to be Furnished With Statements of Promises, etc.*

■ What has been said above disposes of the remaining two motions. The government has indicated that it will allow defendant to inspect all physical evidence that it plans to use at trial and it has indicated further that it has no knowledge of promises, rewards or inducements made to any government witnesses. To the extent that these motions seek to have the government make additional inquiry of law enforcement officials concerning these matters, the motions will be denied. The matter of promises, rewards or inducements will

---

1. The Local Rule spells out the procedure for the government to decline to disclose such information and for ultimate resolution of the issue by the Court. The Local Rule does place the burden on the government to establish the validity of its refusal to furnish the information.

be left for development at trial by cross-examination of the government witnesses.

## FINDINGS SUR MOTION TO SUPPRESS

█ The Bell Federal Savings and Loan Association in Philadelphia was robbed at gun point on September 1, 1970. Stanley Ray Bond was charged [1] with the crime. The case came to trial on September 28, 1971. After the jury had been selected, and after testimony had been taken from several witnesses and before FBI Agent Vincent R. Jones was called to the stand, counsel for Bond orally moved to suppress certain statements made by Bond to Jones when Bond was apprehended at Grand Junction, Colorado on September 27, 1970.

Although such motions are required to be filed in advance of trial (F.R.Crim.P. Rule 41(e)), in the exercise of the court's discretion, the motion was nevertheless entertained. Testimony was taken by the court out of the hearing of the jury and after brief argument, the motion to suppress the statements was denied. These findings are being filed to supplement the court's ruling on the motion.

On September 27, 1970, Agent Jones had a telephone conversation with the manager of the airport at Grand Junction, Colorado. The manager informed Jones that a male passenger had attempted to board the plane with a bag which weighed some 81 pounds, and after being told that he could not take luggage that heavy, that same person later returned with the bag, which now weighed 70 pounds, and attempted to board the plane under the name "Lewis". The airport manager noted that the bag was extraordinarily heavy considering its size.

The manager reported further that a woman had come into the terminal and reported that a male person had stated to her that he had participated in the robbery of a bank in which a police officer had been killed; that he was carrying weapons and "loot"; that he had showed her his picture which had appeared in the newspapers in connection with a bank robbery in Boston, Massachusetts.

After receiving this information from the airport manager, Agent Jones went to the airport and interviewed both the manager and the woman who had furnished the information to the manager. He ascertained from questioning the woman, and from papers in her possession, including her passport, that she was a school teacher from abroad who was in the United States on a visit. She told Agent Jones she had met the man on a flight at about noon on the preceding day, and that she had spent almost the entire succeeding 24 hours in his company. She stated that she did so partly because she feared for her life if she had attempted to leave him. She gave to Jones four different names that the man had used during the period of time she had been in his company. She told him also he had large sums of money which he spent freely. She corroborated the manager's information to the effect that the bag the man was carrying was extremely heavy. The woman also informed Jones that she had personally observed that the man was carrying a pistol on his person.

Jones was satisfied from his investigation and from the woman's manner in recounting this information, that the information was reliable. He then requested that the plane be ordered to return to the Grand Junction terminal and the passengers directed to deplane. Those instructions were followed. The plane did return and the passengers left it. Bond, who was the male passenger referred to by the female informant, was the last to leave. When Bond emerged from the plane, Jones and several other agents, all dressed in civilian

1. Bond was charged with the substantive offenses and was also charged, along with Susan Edith Saxe and Katherine Ann Power, with conspiracy. The latter two have not as yet been apprehended.

working clothes, were in the immediate area. As Bond passed, Jones and another agent approached him from the side, each took hold of one of his wrists and another agent patted him down, reaching under his open jacket. They found a firearm in a holster in his belt at the center of his back. Bond was then told he was under arrest. Immediately upon being advised that he was under arrest and before any warning of any kind was given to him, Bond volunteered "You better get my suitcase off that plane, it has weapons in it."

Bond was then taken to a police car where Agent Jones advised him of his rights. After being advised of his rights, Bond identified himself as Stanley Ray Bond and stated that he did not need an attorney nor did he want one and that he understood his rights. During the trip from the airport to the police station, Bond talked about bank robberies with which Jones was not familiar. Bond stated that he carried the gun for protection.

On arrival at the police station, Bond's bag was searched, after which he was booked and placed in a cell. Later that day, Agent Jones spoke to Bond, read to him the FBI advice of rights form, and asked him to read it. Bond did so and in response to Jones' inquiry, Bond replied that he understood his rights. He refused, however, to sign the advice of rights form containing a waiver. Thereafter, fully aware of his rights, Bond voluntarily spoke to Agent Jones and made certain statements to him concerning crimes unrelated to the Bell robbery.

On the next morning, September 28, 1970, Bond was taken before a United States Commissioner. He was advised of his rights by the Commissioner. Thereafter, he was again interviewed by Agent Jones. Again the advice of rights form was read to Bond and read by Bond. He indicated again he under-

stood what his rights were but refused to sign the form containing the waiver. Notwithstanding his refusal to sign, he thereafter voluntarily, with full understanding of his rights, spoke to Agent Jones and in response to a question whether he had been involved in a recent bank robbery in Philadelphia, answered "that was more practice" and that he "made a molotov cocktail," giving some details as to how he had made it.[2]

The motion to suppress the statements was denied because the court was satisfied and found that the statements were voluntarily made after Bond had been fully informed of his rights as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that he intelligently and knowingly waived his rights in making the statements to Agent Jones.

The court also found and concluded that the information which Agent Jones had obtained from his questioning of the airport manager and the woman, considered in light of his experience as an agent, at the very least furnished reasonable grounds for further investigation to determine whether, in fact, the male person referred to was carrying a firearm aboard an aircraft, in violation of the laws of the United States (49 U. S.C. § 1472(*l*)). Agent Jones' action in requesting the return of the aircraft to ascertain whether firearms were being carried on the aircraft was a proper measure, under the emergency circumstances, to insure the safety of the passengers aboard the craft. The degree of force exerted when the suspect left the plane (the seizing of the wrists) was reasonable and was the minimum necessary for the conduct of a safe frisk for a firearm. Cf. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); United States v. Unverzagt, 424 F.2d 396 (8th Cir. 1970); United States v. Ware, 315 F.Supp. 1333 (W.D.Okla. 1970). Discovery of the firearm fur-

2. Essentially these were the only statements made by Bond which were testified to before the jury by Agent Jones, who also identified several photographs of Bond depicting his appearance at the time of his arrest.

nished ample ground for the arrest which was then made.

Although not necessary to the court's decision, the court also concluded that the information (hereinabove recounted) which had been obtained by Agent Jones was reliable information furnishing probable cause to believe that a bank robbery had been committed and that the person referred to by the witnesses was the person who had committed it. This, in the opinion of the court, would have justified an immediate arrest without a warrant, at the moment the defendant left the plane, even before the frisk was made and the firearm discovered. See McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967).