**UNITED STATES of America,**

v.

**Michael J. GRASSO, Jr. a/k/a "Michael J. Grasso".**

**No. CR. 00–051.**

United States District Court, E.D. Pennsylvania.

Nov. 07, 2001.

Walter M. Phillips, Jr., Hoyle, Morris & Kerr, Philadelphia, PA, Robert J. Anello, Alvin Bragg, Morvillo Abramowitz Grand Iason & Silberberg, New York City, for Michael J. Grasso.

Anne Whatley Chain, U.S. Attorney's Office, Philadelphia, PA, for U.S.

### MEMORANDUM AND ORDER

KAUFFMAN, District Judge.

Defendant is charged in a 495–count Superseding Indictment with the following offenses: mail fraud (Counts 1 through 9 and 11), wire fraud (Counts 10 and 12), obstruction of justice (Count 13), and money laundering (Counts 14 through 495).

The charges stem from Defendant's operation of an allegedly fraudulent "work-at-home" scheme. Now before the Court is Defendant's Motion to Dismiss, for a Bill of Particulars, and for Additional Discovery. For the following reasons, the Motion will be denied in part and granted in part.

Defendant moves to dismiss the Superseding Indictment, arguing that the conduct alleged does not constitute mail or wire fraud, money laundering, or obstruction of justice. The Court disagrees, finding that the Superseding Indictment is legally sufficient. Defendant also argues that the Government violated Fed. R.Crim.P. 6(e) by improperly disclosing grand jury information, but the Court finds that the disclosure was proper. Accordingly, the Court will not dismiss the Superseding Indictment.

Finally, Defendant moves for a bill of particulars and for additional discovery. The Court will order the Government to inform Defendant which allegedly fraudulent solicitations it intends to use at trial and to disclose a witness list one month prior to trial, but will otherwise deny Defendant's requests.

## I. *Factual Background*

■ The following facts are taken from the Superseding Indictment, the allegations of which must be viewed as true for the purpose of deciding a motion to dismiss. *United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir.1990) (citing *Boyce*

*Motor Lines v. United States*, 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 96 L.Ed. 367 (1952)).

Between early 1997 and late 1999, Defendant allegedly operated a series of massive "work-at-home" schemes.[1] (Superseding Indictment Counts 1–9, ¶ 8.) Using various business names,[2] Defendant allegedly placed advertisements and sent direct mailings offering work-at-home employment. (Superseding Indictment Counts 1–9, ¶¶ 9, 10, 14.) These advertisements and mailings stated that, for a fee ranging from ten to forty dollars, readers could become employed stuffing envelopes and stapling booklets at home. (Superseding Indictment Counts 1–9, ¶ 10.) According to the solicitations, no additional expenditures would be required, and refunds would be available. (Superseding Indictment Counts 1–9, ¶¶ 12, 13.)

When readers mailed in their money, they allegedly received in return a set of written instructions that explained how they too could place advertisements offering work-at-home employment similar to those to which they had responded. (Superseding Indictment Counts 1–9, ¶¶ 15, 31.)[3] In other words, Defendant's customers could make money working at home only if they themselves perpetrated the same alleged scheme on others. Also, the program allegedly required additional expenditures for copying, printing, advertising, and postage, and necessitated work outside the home. (Superseding Indict-

---

**1.** Although the Superseding Indictment charges that Defendant's alleged offenses took place during this time period, "the government intends to introduce evidence that Grasso has been engaged in fraudulent work-at-home promotions throughout his adult life." (Mot. Complex Case Designation ¶ 2b.)

**2.** These names included Alternatives, Financial Enterprises, Financial Publishers, Green-

house, GSECO, Hazel Peppergood, Imex, Mesa, Modern Mailers, PMG Associates, Rod Enterprises, Rynex, Welsh Associates, and others. (Superseding Indictment Counts 1–9, ¶ 9.)

**3.** Some customers allegedly received nothing at all. (Superseding Indictment Counts 1–9, ¶ 31.)

ment Counts 1–9, ¶¶ 16, 17.) Finally, Defendant allegedly refused to make refunds to dissatisfied customers. (Superseding Indictment Counts 1–9, ¶ 18.)

Between September 1997 and September 1999, Defendant deposited over ten million dollars into various bank accounts. (Superseding Indictment Counts 1–9, ¶ 30.) The Superseding Indictment identifies ten deliveries from commercial mail receiving agencies to Defendant via United Parcel Service (Counts 1 through 9 and 11) and two transmissions of advertisements via fax (Counts 10 and 12). Additionally, the Superseding Indictment identifies 482 separate transactions (Counts 14 through 495) in which Defendant paid for advertisements, telephone services, printing, envelopes, and other materials with the proceeds of his enterprise. (Superseding Indictment Counts 14–495, ¶ 5.)

A Federal Grand Jury investigated Defendant between January 1999 and February 2000. (Superseding Indictment Count 13, ¶ 4.) In the meantime, on September 15, 1999, the Government filed a civil action, *United States v. Grasso*, Civ. A. No. 99–4622, in which it sought to enjoin the alleged fraud. (Superseding Indictment Count 13, ¶ 3.) The Court (Padova, J.) granted a temporary restraining order freezing Defendant's assets. (Superseding Indictment Count 13, ¶ 5.) [4] Subsequently, according to the Superseding Indictment, Defendant attempted to gain access to his accounts by misrepresenting that it was his father, and not Defendant, who was the subject of the temporary restraining order. (Superseding Indictment Count 13, ¶ 6.)

## II. *Mail and Wire Fraud*

Defendant moves to dismiss the mail and wire fraud counts of the Superseding Indictment, arguing that his solicitations were not fraudulent "because any supposed misrepresentations in or omissions from these solicitations would have been discerned by a reader of ordinary prudence." (Mem.Supp.Mot. Dismiss at 11.)

■■■ "The elements required to support a conviction under the mail fraud statute, 18 U.S.C. § 1341, are: 1) a scheme to defraud; and 2) the use of the mails for the purpose of executing, or attempting to execute, the scheme. The wire fraud statute, 18 U.S.C. § 1343, is identical to the mail fraud statute except it speaks of communications transmitted by wire." *United States v. Frey*, 42 F.3d 795, 797 (3d Cir. 1994) (footnote and citations omitted). Defendant does not dispute his use of wire and the mails. Instead, he argues that he has not engaged in any scheme to defraud.

According to Defendant, "no consumer of ordinary prudence would expect to receive a job earning thousands of dollars per week that required no more than stuffing envelopes and stapling materials. Further, given that it is quite uncommon for a prospective employer to require potential employees to pay an advance fee, no consumer of ordinary prudence would send money to a company allegedly making such an incredulous and extraordinary offer." (Mem.Supp.Mot. Dismiss at 12.) Moreover, Defendant claims, the statements in the solicitations were literally true: his customers would copy, staple, and mail literature (the home-mailing program) to other individuals who responded to their advertisements. (Mem.Supp.Mot. Dismiss at 13.)

■■ Defendant's alleged enterprise is a variant on a well-known device: the pyra-

---

4. The temporary restraining order was later converted by the Court (Waldman, J.) into a preliminary injunction. The civil action re-mains in suspense pending the outcome of this criminal case.

mid scheme. Pyramid schemes "are characterized by the payment by participants of money to the company in return .for which they receive (1) the right to sell a product *and* (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users." *Webster v. Omnitrition Int'l, Inc.,* 79 F.3d 776, 781 (9th Cir.1996) (quoting *In re Koscot Interplanetary, Inc.,* 86 F.T.C. 1106, 1181 (1975), *aff'd sub nom., Turner v. F.T.C.,* 580 F.2d 701 (D.C.Cir.1978)); *accord United States v. Gold Unlimited, Inc.,* 177 F.3d 472, 480–81 (6th Cir.1999).[5]

■ Pyramid schemes appear in a number of forms. For example, in a "chain referral" scheme, participants purchase a product on credit or for a small down payment. The balance is then paid through referring new customers to the company. Eventually, the market becomes saturated as no additional people are willing to participate, and those at the bottom of the pyramid are left without a way to pay for their purchases. *See, e.g., Gold Unlimited,* 177 F.3d at 475–76; *United States v. Armantrout,* 411 F.2d 60, 62–64 (2d Cir.1969); *Blachly v. United States,* 380 F.2d 665, 668–71 (5th Cir.1967). In chain referral schemes, the product is merely incidental: the Defendants in *Gold Unlimited* made only $552,620 profit from sales of gold coin, but took in a total of $43 million and disbursed $25 million in commissions. *Gold Unlimited,* 177 F.3d at 481.[6]

Another common variant is sometimes known as "the Network." One type of this scheme uses a four level pyramid, with a "Chairman" at the top, two "Presidents" at the second level, four "Executive Vice Presidents" at the third level, and eight "Vice Presidents" at the bottom. The eight Vice Presidents each buy into the pyramid, with all the money going to the Chairman. The Chairman then leaves the pyramid, which splits into two, and each participant moves up one level before new Vice Presidents are recruited. *See* Eric Witiw, *Selling the Right to Sell the Same Right to Sell,* 26 Seton Hall L.Rev. 1635, 1636 (1996). The Network faces the same ultimate problem as a chain referral scheme in that the pool of potential investors inevitably dries up. For a person to advance from Vice President to Chairman, 127 people must participate. For a person entering at the twenty-first level, the participation of over 268,000,000 people would be required—more than the population of the United States. *Id.* at 1636–37.[7]

---

5. One type of pyramid scheme that does not require participants to recruit new members is a Ponzi scheme. A Ponzi scheme is one in which earlier investors are paid high rates of interest, which is actually obtained from the payments of later investors. This requires ever-growing numbers of participants, and ultimately the scheme collapses when no more can be found. *See, e.g., Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.,* 189 F.3d 321, 323 n. 1 (3d Cir.1999). It takes its name from Charles Ponzi, who ran such a scheme early in the twentieth century. *Id.* As Chief Justice Taft noted during the subsequent litigation, Ponzi "was always insolvent and became daily more so, the more his business succeeded. He made no investments of any kind, so that all the money he had at any time was solely the result of loans by his dupes." *Cunningham v. Brown,* 265 U.S. 1, 8, 44 S.Ct. 424, 68 L.Ed. 873 (1924).

6. It is the relative importance of product sales as opposed to recruitment that differentiates illegal pyramid schemes from legitimate multi-level marketing systems. *See Gold Unlimited,* 177 F.3d at 482. Also relevant is the presence of effective anti-saturation policies. *See id.* at 484.

7. Such schemes are simply more sophisticated versions of a chain letter scheme, in which the person at the bottom of a list pays the person at the top of the list before removing the name of the top person and selling the list to others, who repeat the process. *See, e.g.,*

Defendant's alleged scheme bears many similarities to "the Network."[8] In an envelope-stuffing scheme such as this one, however, there are only two levels—seller and buyer—and there is no limit to the number of buyers that one seller may have. Once the buyer sends the seller money, the seller leaves the pyramid and the buyer becomes the new seller. Envelope—stuffing schemes also carry the same danger as other pyramid schemes: ultimately, saturation will occur and those at the bottom of the pyramid will be unable to recoup their investment by finding new buyers. Indeed, it has been observed elsewhere that envelope-stuffing enterprises are pyramid schemes. *See United States v. William Savran & Associates,* 755 F.Supp. 1165, 1181 (E.D.N.Y.1991).

Such pyramid schemes, whether they take the form of envelope-stuffing or chain referrals, are inherently fraudulent. *See, e.g., Gold Unlimited,* 177 F.3d at 485; *Armantrout,* 411 F.2d at 61–62; *Blachly,* 380 F.2d at 671; *William Savran & Associates,* 755 F.Supp. at 1181. Thus, the very nature of Defendant's alleged program satisfies the requirement of the mail and wire fraud statutes that there be a scheme to defraud. Because the Superseding Indictment, which must be taken as true at this stage of the proceedings, appropriately alleges the details of Defendant's alleged scheme, the mail and wire fraud counts will not be dismissed.

Even apart from the fact that Defendant allegedly ran an inherently fraudulent pyramid scheme, however, the Superseding Indictment alleges a number of specific misrepresentations made by Defendant, including that the work-at-home employment would include stuffing envelopes and stapling booklets, that advance fees would be refundable, and that there would be no additional costs or expenses.[9] As noted above, Defendant contends that his statements were literally true, and also that no consumer of ordinary prudence would be misled by them.

■ Defendant's arguments are nothing more than attacks on the sufficiency of the evidence, which are inappropriate in a motion to dismiss an indictment. *United States v. DeLaurentis,* 230 F.3d 659, 660 (3d Cir.2000) ("Unless there is a stipulated record, or unless immunity issues are implicated, a pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence.").[10]

*United States v. 21 Items of Mail,* No. 79–119, 1980 U.S.Dist. LEXIS 14431, at *2–*3 (W.D.Pa. Oct. 14, 1980). In all pyramid schemes, "individuals who pay a valuable consideration with the expectation of recouping it to some degree via recruitment are bound to be disappointed." *Omnitrition,* 79 F.3d at 781–82 (quoting *Koscot,* 86 F.T.C. at 1181).

**8.** Defendant's alleged scheme also included a "Plan B" similar to chain-referral schemes, in which individuals could make money by referring new customers to Defendant. (Robert J. Anello Aff. Ex. E, at 4.)

**9.** In this sense, Defendant's alleged scheme bears similarities to traditional fraudulent work-at-home schemes, in which home employment is promised but workers find it nearly impossible to profit or even recoup their initial investment. *See, e.g., United States v. Rabinowitz,* 327 F.2d 62 (6th Cir. 1964).

**10.** Defendant asserts that because the Superseding Indictment refers to the content of particular solicitations, the solicitations are incorporated by reference into the Superseding Indictment. (Reply Mem.Supp.Mot. Dismiss at 5–6.) Defendant further argues that, because they are incorporated by reference, the "materials may properly be scrutinized upon a motion to dismiss." (Reply Mem. Supp.Mot. Dismiss at 5.) The two cases cited by Defendant for this proposition, however, are inapposite. First, they both address the issue of when jeopardy has attached. Sec-

Moreover, the Court notes that Defendant's arguments are identical to those that have been rejected by other courts in cases involving envelope-stuffing schemes. As one court said of similar solicitations, "the central thrust of these documents was to present a vague, confusing and incomprehensible sales promotion without mentioning the product to be sold or the real method of distribution. The Court further finds that these documents were intentionally designed to mislead and to induce innocent and unwary customers to part with money—and so, the documents contain fraudulent misrepresentations." *William Savran & Associates*, 755 F.Supp. at 1177. Another court found that "[w]hile the letters did specifically indicate that the victim was to procure envelopes via classified ads, the nature of the literature, its emphasis on easy money, and the simple fact that prudence implies some reasonable degree of scruples would mislead even the ordinary person with respect to the real mechanics of the scheme." *United States v. Hale*, Nos. 85–5036 & 85–5037, 1985 WL 13767, at *4, 1985 U.S.App. LEXIS 14072, at *12 (6th Cir. Sept. 17, 1985).

■ As far as Defendant's argument that the statements in the solicitations were literally true, "the scheme to defraud element required under § 1341 is not defined according to a technical standard. The standard is a 'reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.' However, 'a scheme may be fraudulent even though no affirmative misrepresentation of fact be made.'" *Id.* (quoting *United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir.1979); *Blachly*, 380 F.2d at 673); *accord Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir.1991). In an envelope-stuffing scheme, "[t]he crime inherent in [the defendants'] conduct is the concealment of material facts about their scheme which they used to induce people to send them money through the mails." *Hale*, 1985 WL 13767, at *5, 1985 U.S.App. LEXIS 14072, at *13.

■ Thus, the Superseding Indictment adequately alleges a number of specific fraudulent misrepresentations and omissions. Although Defendant may dispute the alleged facts at trial,[11] the Court will not evaluate the sufficiency of the evidence on a motion to dismiss. These specific alleged misrepresentations and omissions therefore provide further reason, in addition to the inherently fraudulent nature of the alleged scheme, to deny Defendant's

---

ond, they do not support Defendant's argument. Although Defendant correctly states that in *United States v. Von Barta*, 635 F.2d 999 (2d Cir.1980), the district court "considered the indictment on its face as amplified and limited by letters from the Government, oral representations made in open court, and silence or partial silence of the Government in response to defendant's submissions," he omits mention of the fact that the Second Circuit Court of Appeals referred to this as an "unusual procedure." *Id.* at 1003 & n. 8 (internal quotation marks omitted). Defendant also notes that the district court in *United States v. Velazquez*, 490 F.2d 29 (2d Cir. 1973), relied on evidence submitted with the motion papers, but leaves out the appellate court's remark that there was "no introduc-

tion of evidence as commonly understood in our adversarial system." *Id.* at 34–35. Additionally, the Court notes that, although Defendant has submitted several of his solicitations, the Government states that it will rely on "numerous solicitations" at trial. (Resp.Mot. Dismiss at 2.) Therefore, even if the Court were permitted to evaluate the evidence at this stage of the proceedings, it would be unable to do so.

11. For example, Defendant argues that at trial, "the evidence will demonstrate that [he] had a practice of making refunds to his customers." (Mem.Supp.Mot. Dismiss at 11 n. 8.)

motion to dismiss the mail and wire fraud counts. Accordingly, those counts will not be dismissed.

### III. *Money Laundering*

■■■ Defendant moves to dismiss the money laundering counts of the Superseding Indictment, arguing that the alleged fraud was not completed until Defendant paid for the services that made the fraud possible and, as such, the money used to pay for the services cannot be considered proceeds of the fraud for purposes of the money laundering statute.[12]

■■■ "Section 1956(a)(1)(A)(i) makes it unlawful to conduct a financial transaction involving the proceeds of unlawful activity 'with the intent to promote the carrying on of specified unlawful activity.'" *United States v. Paramo*, 998 F.2d 1212, 1216 (3d Cir.1993).[13] The Superseding Indictment alleges that Defendant conducted numerous financial transactions (i.e., payments to vendors for advertising, printing, and supplies) involving the proceeds of unlawful activity (i.e., mail and wire fraud) with the intent to promote unlawful activity (i.e., further mail and wire fraud).

■■■ "[P]roceeds are derived from an already completed offense, or a complete phase of an ongoing offense, before they can be laundered." *United States v. Conley*, 37 F.3d 970, 980 (3d Cir.1994). Defen-

dant argues that his alleged offense was not completed at the time of the transactions because there was allegedly "one ongoing fraud." (Mem.Supp.Mot. Dismiss at 24.) The Court disagrees.

■■■ Each time Defendant allegedly committed mail fraud by causing a customer to mail him an advance fee, proceeds were created which could be the subject of money laundering charges. *See United States v. Cefaratti*, 221 F.3d 502, 510 (3d Cir.2000) ("The mail fraud … was completed when [the defendant] mailed fraudulent materials in furtherance of his scheme to defraud."); *United States v. Morelli*, 169 F.3d 798, 807 (3d Cir.1999) ("In sum, the money gained in each series of transactions (save the initial one) was the proceeds of wire fraud because the money was the proceeds of a fraud that was furthered by the prior wirings."). In an ongoing fraudulent scheme like that alleged to have been committed by Defendant, money laundering occurs when proceeds of an illegal act are used to further the unlawful scheme. *See, e.g., Cefaratti*, 221 F.3d at 511 (holding that the defendant laundered money when he reinvested fraudulently obtained educational loan money into his school); *Conley*, 37 F.3d at 980 (holding that the defendant laundered money when he used money collected from illegal poker machines to purchase more poker machines).[14]

---

**12.** Defendant also asserts that "the government, as a matter of public policy, should have declined to pursue the money laundering charges," relying on cases applying the Sentencing Guidelines to argue that the "heartland" of money laundering conduct involves drug trafficking and organized crime. (Mem. Supp.Mot. Dismiss at 21–22.) The Court notes that even if the public policy motivating the Government were relevant, "the Money Laundering Control Act 'prohibits a much broader range of conduct than just the classic example of money laundering.'" *United States v. Conley*, 37 F.3d 970, 981 n. 14 (3d

Cir.1994) (quoting *United States v. LeBlanc*, 24 F.3d 340, 346 (1st Cir.1994)).

**13.** This is known as "reinvestment" money laundering, in contrast to "concealment" money laundering, which is prohibited by 18 U.S.C. § 1956(a)(1)(B)(i). *See United States v. Hildebrand*, 152 F.3d 756, 762 (8th Cir.1998).

**14.** Although Defendant dismisses the 482 transactions at issue as "mundane" and complains that "the government seeks to hold [him] criminally liable for merely paying his bills" (Mem.Supp.Mot. Dismiss at 20), the

Defendant further argues that no phase of the alleged scheme was complete until the vendors were paid. (Mem.Supp.Mot. Dismiss at 24–25.) Thus, he states that "according to the superseding indictment, [he] arranged for services and materials necessary to distribute his solicitations, and, finally, rendered payment to his vendors using his customer payments. Therefore, [his] payments were the necessary last step of the phases of the alleged scheme." (Reply Mem.Supp.Mot. Dismiss at 15.)

This argument fails for several reasons. First, Defendant attempts to separate the alleged scheme into components divided by the expenditures necessary to carry them out (e.g., advertising expenses). This misrepresents the essence of the scheme, however. Defendant allegedly placed advertisements on a weekly basis, and each advertisement presumably contributed to the stream of advance payments Defendant received. Defendant's argument incorrectly suggests that once the vendors were paid their weekly fees, the alleged fraud was completed. To the contrary, the alleged fraud occurred when Defendant's customers mailed in their advance fees, acts that could have occurred at any time.

Second, according to the Superseding Indictment, the money that Defendant used to pay his vendors consisted of proceeds from the alleged fraud. Defendant appears to assert that only money obtained through a particular advertisement was used to pay for that advertisement, which seems impossible given the scheme as alleged in the Superseding Indictment. Taken as true, the Superseding Indictment alleges a continuing scheme (or, as Defendant puts it, a "seamless operation" (Mem. Supp.Mot. Dismiss at 24)) in which money was constantly coming in as advance fees and going out as vendor payments.

Third, and most importantly, whether the vendor payments came at the beginning or the end of the cycle is irrelevant. The Third Circuit Court of Appeals has held that "a defendant can engage in financial transactions that promote not only ongoing or future unlawful activity, but also prior unlawful activity." *Paramo*, 998 F.2d at 1218.[15]

The Superseding Indictment alleges that Defendant reinvested the proceeds of his alleged mail and wire fraud in furtherance of a continuing scheme. The Superseding Indictment therefore adequately charges the money laundering offenses. Accord-

Court notes that, according to the Superseding Indictment, these supposedly "mundane" transactions totaled nearly three million dollars (Superseding Indictment Counts 14–295, ¶ 4), and also that Defendant was "merely paying his bills" in furtherance of a scheme that allegedly earned him over ten million dollars (Superseding Indictment Counts 1–9, ¶ 30). Moreover, such transactions in furtherance of a fraudulent scheme do constitute money laundering. *See, e.g., United States v. Lyons Capital*, Nos. 99–4178, 99– 4179, 99–4180, 99–4193, 2000 WL 1792985, at *3, 2000 U.S.App. LEXIS 31308, at *10 (4th Cir. Dec.7, 2000), *cert. denied*, —— U.S. ——, 121 S.Ct. 1503, 149 L.Ed.2d 387 (2001), *and cert. denied*, —— U.S. ——, 122 S.Ct. 139, —— L.E.2d —— (2001) (holding that defendants committed money laundering when they used

advance fees to pay the bills of a fraudulent business); *United States v. Hildebrand*, 152 F.3d 756, 762 (8th Cir.1998) (holding that defendants committed money laundering when they reinvested the proceeds of their fraud by paying for office supplies, secretarial services, and staff wages).

15. Defendant relies upon *United States v. Dimeck*, 24 F.3d 1239 (10th Cir.1994), in which the court held that a courier transporting money obtained from drug trafficking did not commit money laundering. *Id.* at 1246. That case, however, concerned whether concealment of proceeds had occurred; there was no allegation, as there is here, that the proceeds were reinvested to further an unlawful scheme. *Id.*

ingly, the money laundering counts will not be dismissed.

## IV. *Obstruction of Justice*

■ Defendant moves to dismiss the obstruction of justice count of the Superseding Indictment on the ground that his attempt to access his frozen funds was not a crime. He argues that "although violation of a court order may warrant a civil contempt hearing, it should not be the basis for a charge of obstruction of justice." (Mem.Supp.Mot. Dismiss at 26.)

■ "The elements of a prima facie case of obstruction of justice under 18 U.S.C. § 1503 are: (1) the existence of a judicial proceeding; (2) knowledge or notice of the judicial proceeding; (3) acting corruptly with the intent of influencing, obstructing, or impeding the proceeding in the due administration of justice; and (4) the action had the 'natural and probable effect' of interfering with the due administration of justice." *In re Impounded*, 241 F.3d 308, 317 n. 8 (3d Cir.2001) (citing *United States v. Collis*, 128 F.3d 313, 318 (6th Cir.1997)). The Superseding Indictment alleges the existence of a judicial proceeding of which Defendant had notice (i.e., the civil proceeding) and further alleges Defendant's interference with the due administration of justice (i.e., attempting to access assets frozen by court order).

Defendant asserts that obstruction of justice charges are usually brought for cases involving concealment of documents or false testimony. (Mem.Supp.Mot. Dis-

miss at 26.) There is nothing in the statute, however, that limits its scope to these cases only. As the Government states, "[t]he preliminary injunction was entered, in part, to protect assets for distribution to victims during the pendency of the investigation, the grand jury proceeding and the criminal prosecution. Grasso's efforts to obtain this money was a flagrant attempt to defeat one of the primary purposes of the preliminary injunction and related proceedings which is to protect Grasso's victims and provide an opportunity for restitution." (Resp.Mot. Dismiss at 10.)

In a case with virtually identical facts, another court upheld a conviction for obstruction of justice based on the defendant's violation of a court order freezing assets. *United States v. Benjamin*, No. 80 Cr. 443, 1981 U.S.Dist. LEXIS 10579 (S.D.N.Y. Jan. 29, 1981).[16] Apparently facing a similar argument to the one made by Defendant here, the court held that "[n]o reason exists in law and logic for excluding a district judge's temporary restraining order from the scope of § 1503, whose omnibus provision 'is all embracing and designed to meet any corrupt conduct in an endeavor to obstruct or interfere with the due administration of justice.'" *Id.* at *1 (quoting *United States v. Solow*, 138 F.Supp. 812, 814 (S.D.N.Y.1956)).

The Superseding Indictment adequately alleges the elements of the obstruction of justice charge. Accordingly, the obstruction of justice count will not be dismissed.[17]

---

**16.** The defendant in *Benjamin* faced obstruction of justice charges for withdrawing money in violation of a court order freezing his assets. *United States v. Benjamin*, No. 80 Cr. 443, 1981 U.S.Dist. LEXIS 13753, at *1–*2 (S.D.N.Y. July 27, 1981). That order was entered in a related civil case, in which the criminal defendant and others were alleged to have violated the Commodity Exchange Act. *See CFTC v. Pyne Commodities Corp.*, 502

F.Supp. 194 (S.D.N.Y.1980), *aff'd*, 681 F.2d 801 (2d Cir.1981).

**17.** The memoranda of Defendant and the Government on this issue discuss this case's rather complex procedural history. Subsequent to Defendant's alleged attempt to access his funds, as well as the continuation of Defendant's allegedly fraudulent solicitations, the Government moved for civil contempt in

## V. *Disclosure of Grand Jury Materials*

Defendant asserts that the Government provided grand jury evidence to its Civil Division attorneys for use in the related civil case without properly obtaining a court order authorizing the disclosure and, accordingly, the entire Superseding Indictment should be dismissed. This argument is without merit.

■■■ Fed.R.Crim.P. 6(e) imposes secrecy on grand jury proceedings, but allows disclosure by court order. Fed.R.Crim.P. 6(e)(3)(C)(i). Although the requirement of a court order applies to disclosures within the Department of Justice, *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 442, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983), the Government may seek such orders *ex parte*, Fed.R.Crim.P. 6(e)(3)(D).

Defendant makes only a bald assertion that "the attorneys handing the civil matter here apparently failed to" obtain a court order, based on a statement from a Civil Division attorney who "disavowed knowledge of any such orders." (Mem. Supp.Mot. Dismiss at 28.) As the Government points out, however, any orders would have been obtained by the Criminal Division attorneys, and the Civil Division attorneys might well be without knowledge of them. (Resp.Mot. Dismiss at 11.)

In fact, the Government did seek a disclosure order, and the Court (Padova, J.) granted the Government's petition. The appropriate order is on file with the Clerk of the Court, under seal. Thus, Defendant's allegation that the Government did not follow the proper procedure is baseless.[18]

■■■ Defendant further argues that any order was improperly granted,[19] citing the dangers of "joint criminal-civil investigations." (Mem.Supp.Mot. Dismiss at 21.) It is true that the Government may not engage in unregulated sharing of grand jury evidence with Civil Division attorneys, and it is for this reason that the Government is not exempt from the requirement

---

the related civil case before Judge Jay C. Waldman. Judge Waldman denied the motion, principally on the ground that Defendant's pretrial release in this criminal case was conditioned on his obeying the law. (Civ. A. No. 99–CV–4622, docket no. 30.)

The Government subsequently moved in this criminal case for pretrial detention, but Magistrate Judge Linda K. Caracappa denied the motion, stating that the issue of whether Defendant's solicitations were illegal was still unresolved. (Tr. Sept. 5, 2001, at 25.) Magistrate Judge Caracappa did suggest, however, that the Government could file additional charges against Defendant. (Tr. Sept. 5, 2001, at 23.)

At each stage, Defendant has argued—sometimes inconsistently—that the Government should address his conduct in some alternative way. Before Judge Waldman, Defendant argued that it would be more appropriate to pursue the alleged violations in the context of the Defendant's pretrial release. (Civ. A. No. 99–4622, docket no. 25.) Before Magistrate Judge Cracappa, Defendant argued that his conduct should not give rise to pretrial detention. (Tr. Sept. 5, 2001, at 14–17.) Here, Defendant comes full circle and argues that civil contempt would be a more appropriate sanction than obstruction of justice. (Mem.Supp.Mot. Dismiss at 26.) Whatever the best way to respond to Defendant's alleged conduct, the Court simply notes that, given the facts as alleged in the Superseding Indictment, an obstruction of justice charge is one legally sufficient option.

18. This is especially true given Defendant's lack of information in making his charge. In a letter to Defendant's counsel, the Government advised Defendant that it had obtained such orders and that they could be unsealed upon a defense motion. (Anello Aff.Ex. K, at 8–9.) Defendant failed to make such a motion.

19. The Court shares the Government's view that this argument is "curious in light of the fact that [Defendant] has not even reviewed the orders or motions." (Resp.Mot. Dismiss at 12.)

that it obtain court orders authorizing disclosure. *Sells*, 463 U.S. at 442, 103 S.Ct. 3133. In cases where the Government provides a court with a "strong showing of a particularized need for grand jury materials," disclosure may—and should—be authorized. *See id.* at 443, 103 S.Ct. 3133. The Court has reviewed the Government's petition and the Court's order, and finds that this standard was met in this case. Accordingly, there was no violation of Fed. R.Crim.P. 6(e), and there is no cause to dismiss the Superseding Indictment on this ground.[20]

### VI. *Bill of Particulars*

Defendant moves for a bill of particulars pursuant to Fed.R.Crim.P. 7(f). His request contains seventy-five separate paragraphs, many with sub-parts. The Government opposes the request, asserting that it has already provided extensive discovery to Defendant. (Resp.Mot. Dismiss at 13.)

■ . Whether to order a bill of particulars is a matter within the Court's discretion. *United States v. Kenny*, 462 F.2d 1205, 1212 (3d Cir.1972). "The purpose of a bill of particulars is to inform the defendant of the nature of the charges brought against him to adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense. A bill of particulars should fulfill this function when the indictment itself is too vague and indefinite for such purposes." *United States v. Addonizio*, 451 F.2d 49, 63–64 (3d Cir.1971) (internal quotation marks and citations omitted).

■ The functions of a bill of particulars are "more akin to the functions of an indictment than to discovery." *United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir.1985). For this reason, the Court will not order the Government to "answer a set of detailed interrogatories in the guise of a bill of particulars." *Kenny*, 462 F.2d at 1212; *see also United States v. Traitz*, Crim.A. No. 99–003, 1999 WL 551924, at *2, 1999 U.S.Dist. LEXIS 11425, at *6 (E.D.Pa. July 15, 1999).

■ The Superseding Indictment in this case is neither vague nor indefinite. Although it is true that the alleged scheme is complex, the Superseding Indictment provides an accounting of the mailings and wirings alleged to support the mail and wire fraud counts and of the transactions alleged to support the money laundering counts.

■ Moreover, the Government has provided extensive discovery, which significantly lessens any need for a bill of particulars. See *United States v. LBS Bank— New York, Inc.*, 757 F.Supp. 496, 507 (E.D.Pa.1990). Indeed, Defendant's complaint is that the Government has provided too much discovery: he states that "the sheer volume of the discovery available for Mr. Grasso's inspection is the precise reason why the Court should grant Mr. Gras-

---

20. Additionally, the Court notes that this is not the type of situation where dismissal would be an appropriate remedy for a violation. "[D]ismissal of the indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988) (quoting *United States v. Mechanik*, 475 U.S. 66, 78, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986) (O'Connor, J., concurring)). Here, even were the facts as Defendant claims, the alleged prejudice was in freezing Defendant's assets, which supposedly made him unable to afford the expert witnesses he purportedly now requires. (Mem.Supp.Mot. Dismiss at 30.) There is no suggestion that the disclosure in any way influenced the grand jury's decision to indict.

so's motion for a bill of particulars." (Mem.Supp.Mot. Dismiss at 36.)

 The Court is mindful of the "difficulty the defense is having in attempting to pull a probative needle or two out of the many large proverbial haystacks which the government has made available." *United States v. McDade*, Crim.A. No. 92–249, 1992 WL 382351, at *1, 1992 U.S.Dist. LEXIS 19254, at *4 (E.D.Pa. Dec. 11, 1992). The purpose of a bill of particulars, however, is "to give the defendant only that minimum amount of information necessary to permit the defendant to conduct his *own* investigation." *Smith*, 776 F.2d at 1111. Such information has already been provided to Defendant by the Government, so there is no need to order the bill of particulars requested by Defendant.

Defendant complains that "[h]aving not been informed of the specific documents or events referred to in the superseding indictment, Mr. Grasso is being forced to prepare to defend every aspect of all of the businesses with which he was involved for the period of the superseding indictment with no guidance from the government regarding the true nature of the claims against him." (Mem.Supp.Mot. Dismiss at 33.) As discussed above, the Court finds that the Superseding Indictment provides sufficient information for Defendant to prepare his case, and is skeptical that Defendant is unable to understand the "true nature" of the charges. Nevertheless, the Court will order that the Government in-

form Defendant which solicitations it intends to use at trial to support the mail and wire fraud charges.[21] In all other respects, Defendant's request for a bill of particulars will be denied.[22]

## VII. *Additional Discovery*

 Defendant also seeks several types of additional discovery. First, he requests disclosure of the Government's witness list one month prior to trial. (Mem.Supp.Mot. Dismiss at 38.) Although disclosure of a witness list is not automatic in non-capital cases, the Court "may order such disclosure to ensure the effective administration of the criminal justice system." *Government of Virgin Islands v. Martinez*, 847 F.2d 125, 128 (3d Cir.1988) (internal quotation marks and citation omitted). Because the Government has not identified any reason why it should not be required to disclose its witness list, and because there is no suggestion that "disclosure may pose a threat to [any] witness," *id.*, the Court will grant Defendant's request.

Second, Defendant asks that the Government produce Jencks Act[23] materials one month prior to trial. (Mem.Supp.Mot. Dismiss at 39.) The Government, however, represents that "Grasso has received Jencks Act materials and has been advised that grand jury transcripts will be made available prior to trial." (Resp.Mot. Dismiss at 16.) Accordingly, there is no need to grant Defendant's request at this time.

---

**21.** The Government need not, however, comply with Defendant's request that it "identify the allegedly material false statement included" in each solicitation. (Anello Aff. Ex. I, ¶ 11.) As noted above, the scheme as alleged was inherently fraudulent. Additionally, the Government has alleged numerous specific misrepresentations in the solicitations.

**22.** There is no evidence to support Defendant's allegation that "the government has in

its possession documents that reflect his practice of providing refunds." (Mem.Supp.Mot. Dismiss at 35; *see also* Resp.Mot. Dismiss at 15.) *Cf. Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (holding that the Government has an obligation to disclose exculpatory evidence).

**23.** 18 U.S.C. § 3500.

Third, Defendant asks that the Government disclose evidence of prior bad acts it intends to introduce at trial. (Mem.Supp. Mot. Dismiss at 39.) The Government represents that it has provided this discovery. (Resp.Mot. Dismiss at 16.) Accordingly, the Court will not grant Defendant's request at this time.

Fourth, Defendant requests the disclosure of hearsay statements the Government attributes to him. (Mem.Supp.Mot. Dismiss at 40.) Defendant acknowledges, however, that the Government has agreed to provide notice of such statements prior to trial. (Mem.Supp.Mot. Dismiss at 40.) Accordingly, the Court will not grant Defendant's request at this time.

 Finally, Defendant seeks disclosure of grand jury information. Specifically, Defendant asks for disclosure of the grand jury's impanelment and adjournment dates and the legal instructions provided to the grand jury. (Mem.Supp.Mot. Dismiss at 40–41.) Defendant, however, has not shown a "particularized need" for this information that overrides the interest in grand jury secrecy. *See Sells,* 463 U.S. at 442, 103 S.Ct. 3133. He argues that "the grand jury may have been misinformed about the type of conduct necessary to constitute the offenses alleged in the superseding indictment." (Mem.Supp. Mot. Dismiss at 41.) This argument is apparently predicated on Defendant's belief that the allegations in the Superseding Indictment do not constitute criminal activity. As discussed above, however, the Court finds the Superseding Indictment legally sufficient. Accordingly, the Court will deny Defendant's request.

## VIII. *Conclusion*

For the foregoing reasons, Defendant's Motion to Dismiss, for a Bill of Particulars, and for Additional Discovery will be denied in part and granted in part. The Court rejects all of Defendant's arguments that the Superseding Indictment should be dismissed, finding that the mail and wire fraud, money laundering, and obstruction of justice counts are all legally sufficient, and finding no violation of Fed.R.Crim.P. 6(e). The Court will deny Defendant's request for a bill of particulars, except that it will order the Government to disclose to Defendant the solicitations on which it intends to rely at trial. Finally, the Court will deny Defendant's requests for additional discovery, except that it will order the Government to disclose, one month before trial, a list of the witnesses it intends to call.

An appropriate Order follows.